SOWERS et al., Appellants,

v.

MIDDLETOWN HOSPITAL et al., Appellees.

[Cite as *Sowers v. Middletown Hosp.* (1993), 89 Ohio App.3d 572.]

Court of Appeals of Ohio,
Butler County.

No. CA92–07–118.

Decided June 14, 1993.

574

*Ruppert, Bronson, Chicarelli & Smith Co., L.P.A., James D. Ruppert* and *John D. Smith,* for appellants.

*Scheper & McGowan, James H. Scheper,* for appellees Kah and Gynecological Consultants, Inc.

*Lindhorst & Dreidame* and *John A. Goldberg,* for appellee Middletown Hospital Association.

*Greene & Bloom* and *Gordon C. Greene,* for appellees Oches, Swisher, Perkins and Children's Medical Center, Inc.

WALSH, Judge.

Plaintiff-appellant, Richard Sowers ("Richard"), by and through his natural mother, Trudy Sowers ("Sowers"),[1] appeals a jury verdict before the Butler County Court of Common Pleas in favor of defendants-appellees, Middletown Hospital Association, Ralph E. Kah, M.D., Gynecological Consultants, Inc., Ronald E. Oches, M.D., Marian Swisher, M.D., John R. Perkins, M.D., and Children's Medical Center, Inc. Dr. Kah operates his gynecological practice through Gynecological Consultants, Inc. and Drs. Oches, Swisher and Perkins operate their pediatric practice through Children's Medical Center, Inc.

Appellants filed this medical malpractice action on July 29, 1987. The complaint states that Richard suffers from severe psychomotor and mental retardation, cerebral palsy and seizures as a result of appellees' negligence during labor, delivery and the two days thereafter. A jury heard the case between February 18, 1992 and March 11, 1992.

---

1. Richard Sowers and Trudy Sowers are described as "appellants" when referred to collectively herein.

The evidence presented at trial indicates that Sowers arrived at Middletown Hospital in the early stages of labor at 4:30 a.m. on April 25, 1980. She was outfitted with an external fetal monitor at 5:30 a.m., which remained in place until 7:30 a.m. Appellants presented testimony that the monitor displayed "nonreassuring and worrisome" signs during this two-hour period. Dr. Kah examined Sowers at 7:30 a.m. during his daily rounds; because Sowers' contractions were infrequent, Dr. Kah instructed her to ambulate to encourage the progression of labor.

At noon, Dr. Kah ordered the administration of one hundred milligrams of Vistaril to calm Sowers. The external fetal monitor was reattached at 12:20 p.m. At that time, Sowers' cervix was dilated to four centimeters and was one hundred percent effaced. These characteristics are consistent with progress in labor, but appellants again presented testimony of "nonreassuring" fetal monitor readings between 12:20 p.m. and 4:30 p.m.

Sowers' membranes spontaneously ruptured at 4:30 p.m., that is, her water broke. The baby had entered the zero station position and the cervix was dilated to five centimeters. Oxygen was administered and an internal fetal monitor was applied. The internal monitor recorded a fetal heart rate of 100, which is below normal and may have indicated decreased oxygen to the baby's vital organs. In addition, meconium fluid [2] was detected. The nursing staff did not notify Dr. Kah of these developments.

During a telephone conversation at 6:15 p.m. with a member of the obstetric nursing staff, Dr. Kah ordered the administration of Pitocin, a labor-enhancing drug, because Sowers' contractions remained infrequent. Between 6:15 and 9:30, the Pitocin dosage was increased in an attempt to further stimulate labor. The Pitocin was effective in increasing Sowers' contractions, and Dr. Kah delivered Richard at 9:55 p.m. Richard was assigned Apgar [3] scores of three at one minute and five at five minutes. As a result, he was transferred to the intensive care nursery.

After Richard was born, Drs. Swisher, Perkins and Oches, who rotated pediatric coverage on the weekends, became responsible for his treatment. While in intensive care, Richard exhibited rigidity, spasticity and signs of

---

**2.** Meconium is the first intestinal discharges of the newborn infant, greenish in color and consisting of epithelial cells, mucus, and bile. Stedman's Medical Dictionary (5 Ed.Rev.1982) 842.

**3.** An Apgar score is an evaluation of a newborn infant's physical status by assigning numerical values (0 to 2) to each of five criteria: heart rate, respiratory effort, muscle tone, response to stimulation, and skin color; a score of 10 indicates the best possible condition. Stedman's Medical Dictionary, *supra*, at 1266.

neuromuscular irritability. He was also cyanotic[4] and experienced breathing problems. The nursing staff in intensive care contacted Dr. Swisher several times during the late evening hours of April 25 and early morning hours of April 26 regarding Richard's condition. After being notified that a dextrose stick test was abnormal, Dr. Swisher ordered a microsugar test to determine Richard's blood-sugar level. Apparently, the dextrose stick test often produces erroneous results. However, because Dr. Swisher interpreted the overall information relayed during the nurses' calls to mean Richard was improving, he did not examine Richard at the hospital.

Dr. Perkins examined Richard during his hospital rounds at 8:00 a.m. on April 26. The examination revealed periods of prolonged apnea[5] and cyanosis. Richard also exhibited periods of intermittent seizure activity during the examination. Dr. Perkins administered oxygen, started an I.V., and ordered blood tests and a chest x-ray. The test results and the chest x-ray fell within normal limits.

In addition to the 8:00 a.m. examination, Dr. Perkins examined Richard at noon, 4:10 p.m. and 10:00 p.m. During the noon visit, Dr. Perkins, concerned about swelling of the brain, decreased the input of fluids. Dr. Perkins also ordered that Richard's urine output be measured every four hours and prescribed antibiotics to address possible bacterial infection. He did not order phenobarbitol, a seizure medication, at that time because of his fear that it would accentuate Richard's apneic spells.

During the 4:10 p.m. visit, Dr. Perkins performed a spinal tap to test for intracranial bleeding. Richard was active and crying and tolerated the procedure well. The apneic spells had ceased, but the nurses' notes suggested the possibility of some minor seizure activity during Dr. Perkins' absence.

At 8:50 p.m., the attending nurse telephoned Dr. Perkins with descriptions of additional seizure activity. As a result, Dr. Perkins administered phenobarbitol. Dr. Perkins then visited Richard at the hospital at 10:00 p.m. to monitor the effects of the phenobarbitol. During this examination, Richard was breathing well but experiencing definite seizure activity. Dr. Perkins left orders to increase the phenobarbitol if sustained seizures began and to perform blood tests the following morning. The seizures continued during the night and the phenobarbitol dosage was increased on two occasions.

Dr. Oches examined Richard during the morning of April 27. After the examination, he ordered the continuation of phenobarbitol pursuant to a regular

---

4. Cyanosis is a dark bluish or purplish coloration of the skin due to deficient oxygenation of the blood. Stedman's Medical Dictionary, *supra,* at 348.

5. Apnea is the absence of breathing. Stedman's Medical Dictionary, *supra,* at 97.

schedule of dosage. At 4:25 p.m., Dr. Oches was notified that Richard's seizure activity was continuing. He ordered a blood-sugar test and an extra dose of phenobarbitol. The blood test results were within normal limits.

At 7:40 p.m., Dr. Oches was notified that Richard's seizures were becoming more frequent. Dr. Oches added Dilantin to the phenobarbitol. At approximately 9:00 p.m., Dr. Oches was notified that there had been no change in the seizure activity. At 11:00 p.m., he ordered that Richard be transferred to Children's Hospital in Cincinnati.

At trial, appellants sought to prove that all of the nurses and physicians involved in Richard's care until the transfer to Children's Hospital had violated their professional standard of care. Appellants argued that the nurses involved were negligent for failing to recognize abnormal patterns on the fetal heart monitoring strips, for not notifying a physician of these patterns, and for not discontinuing Pitocin once the abnormal patterns appeared.

Appellant argued that Dr. Kah was negligent in not recognizing the abnormal fetal heart patterns, failing to artificially rupture the membranes at 7:30 a.m. on April 25, ordering Pitocin, and in not performing a Cesarean section at 5:00 p.m. Appellant also charged that Dr. Swisher should have examined Richard at the hospital; that Dr. Perkins should have administered phenobarbitol earlier and transferred Richard to Children's Hospital; and that Dr. Oches should have transferred Richard to Children's Hospital immediately upon examining him.

On March 11, 1992, the jury found that Drs. Kah, Swisher, Perkins, and Oches were not negligent. Although the jury found Middletown Hospital negligent, the jury determined that the hospital's negligence did not cause Richard's injuries. Appellants filed a motion for new trial, which the court denied on June 9, 1992.

On appeal, appellants present eleven assignments of error for review. We address each assignment in order.

By their first assignment of error, appellants contend that the trial court erred in its rulings on several challenges for cause during voir dire. Appellants allege that the trial court "consistently and blatantly" ruled on challenges for cause "in a biased and prejudicial manner favorable to the defense." We do not agree.

R.C. 2313.42 lists ten ways to justify challenging a juror for cause:

"(A) That he has been convicted of a crime which by law renders him disqualified to serve on a jury;

"(B) That he has an interest in the cause;

"(C) That he has an action pending between him and either party;

"(D) That he formerly was a juror in the same cause;

"(E) That he is the employer, the employee, or the spouse, parent, son, or daughter of the employer or employee, counselor, agent, steward, or attorney of either party;

"(F) That he is subpoenaed in good faith as a witness in the cause;

"(G) That he is akin by consanguinity or affinity within the fourth degree, to either party, or to the attorney of either party;

"(H) That he or his spouse, parent, son, or daughter is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against him;

"(I) That he, not being a regular juror of the term, has already served as a talesman in the trial of any cause, in any court of record in the county within the preceding twelve months;

"(J) That he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court."

Additionally, R.C. 2313.42 states, "[e]ach challenge listed in this section shall be considered as a principal challenge, and its validity tried by the court." Further, "[t]he determination of whether a prospective juror should be disqualified for cause pursuant to R.C. 2313.42(J) is a discretionary function of the trial court. Such determination will not be reversed on appeal absent an abuse of discretion. * * *" *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 559 N.E.2d 1301, syllabus. An abuse of discretion constitutes more than an error of law; it implies that the trial court acted unreasonably, arbitrarily or unconscionably. *Rigby v. Lake Cty.* (1991), 58 Ohio St.3d 269, 569 N.E.2d 1056.

Appellants make four arguments in attacking the trial court's rulings on their challenges for cause. Appellants' first argument is a general one involving two nurses and one medical-records employee who were members of the venire. Appellants' position is that nurses and other medical personnel should not be permitted to sit on a jury in a medical malpractice trial. Appellants argue that it "violates fundamental fairness" and that there is "inherent bias" in allowing such individuals to serve on a medical malpractice jury. The trial court refused to take this automatic approach in ruling on appellants' challenges of the nurses and the medical-records employee.

In examining the ten statutory challenges for cause listed in R.C. 2313.42, we are unable to justify the exclusion of nurses and other medical personnel simply because they are members of the venire in a medical malpractice trial. Appellants have cited no authority for their position and have failed to refer this court to any comments by the three prospective jurors indicating bias. Instead, appellants make the conclusory allegation that all nurses and other medical

personnel are inherently biased in favor of physicians and hospitals. Because of their role as patient advocate, however, one may easily argue that nurses are biased toward plaintiffs in medical malpractice trials, not defendants. Further, we find it difficult to understand how appellants were prejudiced by the court's refusal to apply their automatic exclusion, as neither the two nurses nor the medical-records employee sat on the jury in the present case.[6] This court concludes that the automatic exclusion of nurses and other medical personnel from medical malpractice juries is not within the realm of R.C. 2313.42. Even if we found appellants' position to be valid, statutory revisions are a function of the legislature, not the judiciary.

■ Second, appellants argue that the court made "inconsistent and prejudicial rulings" regarding their challenges for cause of the two nurses mentioned above. Appellants first challenged Nurse Tonya Larson for cause based on her "inherent bias" position and for the reason that she would "dominate" the jury because of her specialized training in the medical field. The trial court denied the request, finding that appellants had not established one of the ten statutory challenges for cause.

Our review of the voir dire transcript reveals that the court correctly denied the challenge of Nurse Larson. Nurse Larson specifically denied the allegation that her association with the medical profession would cause her to favor appellees. The remainder of her answers during voir dire also fail to indicate that she could not be a fair and impartial juror. See R.C. 2313.42(J). Moreover, Nurse Larson stated during voir dire that she had never worked in labor and delivery, had no training in interpreting fetal monitor strips, and had no experience in pediatric neurology. Based on Nurse Larson's professional experience, appellants' argument that she would "dominate" the jury in the present case carries little weight. Also, again, appellants were not prejudiced by the court's denial of the challenge of Nurse Larson as appellants were able to utilize a peremptory challenge to eliminate her from the jury. For all of these reasons, the court did not abuse its discretion in failing to excuse Nurse Larson for cause.

■ Appellants also challenged Nurse Joyce Arand for cause, again arguing that nurses are "inherently biased" and "dominate" medical malpractice juries. Appellees agreed that Nurse Arand should be challenged for cause and the court excused her. Appellants argue that the court's handling of Nurses Larson and Arand typifies its favorable treatment of appellees. Unlike Nurse Larson, however, Nurse Arand did not demonstrate an ability to be fair and impartial. Arand indicated during voir dire that she worked in labor and delivery and would

---

6. The venire also included a third nurse who was chosen as an alternate juror and ultimately served on the jury. As will become clear below, appellants failed to challenge the third nurse.

likely have her own interpretations of the fetal monitor strips presented at trial. Although the trial judge did not state his reasons for allowing Nurse Arand to be challenged for cause, we find that her statements regarding the fetal monitor strips evidenced an inability to be impartial during the interpretation of the strips by the parties' experts. Thus, a valid challenge for cause as to Nurse Arand existed under R.C. 2313.42(J). The trial court did not abuse its discretion in allowing Nurse Arand to be challenged for cause.

Appellants' third argument regarding challenges for cause concerns a prospective juror whom the trial judge excused because she admitted having a "bad experience" with Dr. Kah. The prospective juror alleged during voir dire that Dr. Kah injured her son with forceps during delivery. Upon hearing these comments, the judge immediately dismissed the prospective juror. Appellants claim that this ruling prejudiced their case because they were not permitted to question the prospective juror in an attempt to "rehabilitate" her. Appellants, though, failed to object to the dismissal and did not even request an opportunity to ask follow-up questions. Further, we find that the prospective juror's comments sufficiently indicated an inability to be fair and impartial, which is a valid cause for challenge under R.C. 2313.42(J). Accordingly, the judge did not abuse his discretion in excusing this member of the venire.

Finally, appellants criticize the trial court's handling of "prospective jurors who were effusive in their glowing praise" of appellees. During voir dire, prospective jurors Nicholson, Coston, Boschert, Morgan, and Milliser stated that the appellee physicians had cared for either themselves or their children. Several did comment positively on appellees' treatment; however, the comments were hardly the "glowing praise" described by appellants. Additionally, Nicholson, Morgan and Boschert adequately explained their ability to be fair and impartial if chosen for the jury. Coston and Milliser did not display such qualities and both were excused for cause, Milliser on appellants' request. Of these five prospective jurors, only Morgan ultimately sat on the jury. Upon review of the voir dire transcript, we find that Morgan explicitly stated that he "would not hesitate" to return a verdict against appellees if the evidence so indicated. Based on the foregoing, we are unable to ascertain how appellants were prejudiced by the court's handling of these five prospective jurors. The trial court acted correctly and did not abuse its discretion. As we have dispensed with all of the arguments underlying appellants' first assignment of error, that assignment is overruled.

By their second assignment of error, appellants contend that the trial court erred in dismissing juror Higginbotham, who developed a dental problem during the trial. We do not agree.

Civ.R. 47(C) states in pertinent part as follows: "Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." The decision whether an allegedly disabled juror should be replaced by an alternate is within the trial court's discretion. *State v. Shields* (1984), 15 Ohio App.3d 112, 15 OBR 202, 472 N.E.2d 1110.

Our review of the record clearly indicates that Higginbotham communicated to the trial judge that he was in tremendous pain and needed dental treatment. Higginbotham did not indicate when, or if, he would be able to return. Thus, especially in light of the complex scheduling of medical experts from across the country which became necessary in the present case, we find that the judge properly utilized Civ.R. 47(C) to replace Higginbotham with an alternate juror.

Appellants' true complaint is that Higginbotham was replaced with Kathleen Stevens, a nurse who formerly worked in pediatrics. Again, appellants make the argument that Nurse Stevens was biased because of her medical training and background. However, appellants failed to challenge Nurse Stevens for cause during voir dire. Appellants also chose not to exercise a peremptory challenge against Nurse Stevens. In addition, a review of the voir dire questioning reveals that Nurse Stevens made no statements revealing any bias or partiality toward appellees. Further, the jury interrogatories reveal that even without Stevens' vote the jury would have found for appellees by the requisite three-fourths majority. For all of these reasons, we cannot conclude that appellants were prejudiced by the placement of Nurse Stevens on the jury or that the trial court abused its discretion in making the substitution. Appellants' second assignment of error is overruled.

By their third assignment of error, appellants argue that the trial court erred in not granting a new trial upon the discovery of alleged juror misconduct. We do not agree.

Civ.R. 59 lists nine specific grounds upon which a new trial may be granted, including jury misconduct. See Civ.R. 59(A)(2). A trial court's ruling on a motion for new trial which is predicated upon juror misconduct will not be disturbed unless the court's ruling constituted an abuse of discretion. *Ohio Turnpike Comm. v. Ellis* (1955), 164 Ohio St. 377, 58 O.O. 179, 131 N.E.2d 397, certiorari denied (1956), 352 U.S. 806, 77 S.Ct. 51, 1 L.Ed.2d 39, overruled on other grounds by *Masheter v. Hoffman* (1973), 34 Ohio St.2d 213, 63 O.O.2d 357, 298 N.E.2d 142.

In the present case, one of the court reporters informed appellants that Nurse Stevens, the alternate juror, and Nurse Janet Dalton Majors, a representative of Middletown Hospital, spoke to each other during a court recess which occurred at

the voir dire stage. Appellants filed a motion for new trial on April 2, 1992, which included a sworn affidavit signed by the court reporter. The affidavit states that the court reporter observed Nurse Stevens and Nurse Dalton Majors converse, that she could not hear what was said, and that "smiles were exchanged." Dr. Kah's memorandum in opposition to appellants' motion for new trial was accompanied by a sworn affidavit signed by Nurse Stevens. Nurse Stevens' affidavit states that "at no time did [she] talk to or communicate with Janet Dalton Majors * * *." Apparently, Nurse Dalton Majors made no sworn statement.

Upon review of the record, we cannot conclude that the trial court erred in overruling appellants' motion for new trial based on the previous series of events. There is no evidence that the alleged conversation concerned the trial and the parties had not even begun opening arguments. In fact, the substance and the length of the alleged, seemingly casual, conversation is not addressed. Additionally, Nurse Stevens denies, through sworn affidavit, that the conversation occurred. Further, the voir dire transcript reveals no bias by Nurse Stevens. Based on the foregoing reasoning, the trial court did not abuse its discretion in finding that the alleged juror misconduct did not require a new trial.

By their fourth assignment of error, appellants contend that the trial court misapplied Evid.R. 104(B) at various points throughout the trial. After reviewing the record, however, we find that appellants have built their argument around the wrong evidentiary proposition. Based on the following rationale, we overrule appellants' fourth assignment of error.

Appellants' first criticism of the trial court under this assignment involves a hypothetical question asked to appellants' pediatric expert, Steven Donn, M.D., during direct examination. Appellants' counsel stated the hypothetical question as follows:

"MR. RUPPERT: Dr. Donn, you had mentioned in that capsulization there was meconium passage. I would ask you to assume that you had been called as a pediatrician and advised that the records in this case reflect that there was spontaneous rupture of the membranes at 4:30 p.m., that the fetal heart rate had decreased to to [sic] 100, oxygen was started at 67 liters per mask for 15 minutes. The record also indicates that, at 5:20, there was greenish brown fluid noted by the nurse when the patient voided on the bed pan. What significance if any do those finding have to you as a pediatrician?

"MR. GREENE: Objection may it please the court."

The court sustained the objection on the basis that there was no evidence the pediatricians, Drs. Swisher, Perkins and Oches, were called before Richard was born. The following exchange then occurred regarding the hypothetical question:

"THE COURT: Only way you can ask such a question is if it's already in evidence, that fact is already in evidence or they have been perceived by the witness.

"MR. RUPPERT: That's wrong.

"THE COURT: The rule is the rule.

"MR. RUPPERT: I don't think that—

"THE COURT: All I have to go on but I need it on the record.

"MR. RUPPERT: All I need to to [*sic*] link it up.

"THE COURT: I may be wrong but the legislature wrote it. If the legislature didn't write it right, I'm sorry, but it's in the rules. And the Supreme Court have [*sic*] written it that way it's, that's the rule in Ohio. I grant you it's not the rules of the Federal Court. That's the rule in Ohio."

Appellants characterize the court's ruling and its subsequent comments as a misapplication and misunderstanding of Evid.R. 104(B), which addresses conditional relevancy. We instead view the court's ruling as a proper application of Evid.R. 703 and 705.

▇▇▇ Evid.R. 703 addresses the permitted bases for expert opinion testimony: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing." Evid.R. 705 requires the identification of the specific facts supporting an expert opinion: "The expert may testify in terms of opinion or inference and give his reasons therefor after disclosure of the underlying facts or data. The disclosure may be in response to a hypothetical question or otherwise." Additionally, it is well established that an expert can base an opinion only on facts presented in a hypothetical question if evidence tending to establish those facts is admitted into evidence. *Mayhorn v. Pavey* (1982), 8 Ohio App.3d 189, 8 OBR 258, 456 N.E.2d 1222, and cases cited therein.

▇▇▇ In the present case, appellants could not offer evidence that a pediatrician analyzed the circumstances prior to Richard's birth, as Drs. Swisher, Perkins and Oches did not become involved in Richard's treatment until after his birth. Thus, based on the rule espoused in *Mayhorn,* Dr. Donn could not be asked to assume in a hypothetical question that he was the pediatrician consulting on the case before Richard's birth. Further, Evid.R. 705 is diametrically opposed to Fed.R.Evid. 705, which does not require disclosure of the facts supporting an expert opinion. This difference explains the trial court's above statement that "it's not the rules of the federal court," which appellants identify as a misunderstanding of the Rules of Evidence. In any event, when appellants' counsel later rephrased his question, Dr. Donn was able to express his opinion that both Dr.

Kah and the attending nurses violated the appropriate standard of professional care in failing to notify a pediatrician before Richard was born. For these reasons, the trial court ruled correctly on appellees' objection to the hypothetical question regarding pre-birth pediatric consultation.

Appellants' second criticism of the trial court under the fourth assignment relates to a question posed to Dr. William Ball, Jr., M.D., an attending radiologist at Children's Hospital in Cincinnati. Appellants' counsel phrased the question as follows:

"MR. SMITH: Doctor, do you have an opinion, based upon a reasonable medical certainty as to whether the CAT scan findings of May 12, 1980 are consistent with an hypoxic-ischemic event that would have occurred on April 25?

"MR. GREENE: Objection.

"THE COURT: Sustained."

The court sustained appellees' objection on the basis that Dr. Ball could not render an opinion on hypoxic-ischemia because he reviewed only the radiologic images in the case, not the clinical records, and thus had no knowledge that a hypoxic-ischemic event did occur. The court also found that there was no evidence at that point in the trial as to whether a hypoxic-ischemic [7] event occurred. Appellant again characterizes this ruling as a misapplication of Evid.R. 104(B).

After reviewing Dr. Ball's testimony, we have determined that appellants' counsel implicitly asked Dr. Ball to assume that a hypoxic-ischemic event occurred on April 25. Because this is again an issue of expert testimony and not conditional relevancy, we analyze the court's ruling in the context of Evid.R. 703 and 705, not Evid.R. 104(B).

Dr. Ball had no independent knowledge regarding the occurrence of hypoxic-ischemia, as he examined only the radiologic images in Richard's chart, not the chart itself, in preparation for his testimony. This is verified by Dr. Ball's testimony and by appellants' pretrial statement. Also, appellants had not presented evidence that a hypoxic-ischemic event occurred on April 25 before Dr. Ball's testimony. Therefore, the fact that appellants implicitly asked Dr. Ball to assume had not been addressed by the evidence and the trial court properly disallowed the question. Appellants' fourth assignment of error is overruled.

By their fifth assignment of error, appellants contend that the trial court failed to exercise reasonable control over the presentation of evidence. Specifi-

---

7. A hypoxic-ischemic event is a combination of below-normal levels of oxygen in the blood or tissue and a reduction in blood flow. Stedman's Medical Dictionary, *supra,* at 685.

cally, appellants argue that the court assisted in rendering Dr. Donn's testimony "completely indecipherable" by allowing appellees to object over ninety times during his testimony. We do not agree.

Evid.R. 611(A) outlines the court's duty to control the interrogation of witnesses:

"(A) Control by court. The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

In reviewing Dr. Donn's testimony, we are also guided by the principle that "[a] reviewing court may not substitute its judgment for that of the trial court absent an abuse of discretion." *Tracy v. Merrell Dow Pharmaceuticals* (1991), 58 Ohio St.3d 147, 152, 569 N.E.2d 875, 880.

We have studied the eight-hour testimony of Dr. Donn in its entirety and find that the trial court complied with Evid.R. 611(A). Appellees did enter numerous objections during Dr. Donn's testimony, but the court sustained a significant number of those objections. Appellees were obligated under Evid.R. 103(A) to voice their objections to preserve error for appeal and this court knows of no rule allowing only a certain number of objections per witness. In addition, the objections did not prevent Dr. Donn from fully expressing his opinions on the elements of appellants' prima facie case. Furthermore, we have found no evidence of harassment or bad faith in appellees' objections. We have also found no evidence of the favoritism by the trial judge of which appellants complain. For these reasons, we conclude that the trial court did not abuse its discretion while presiding over Dr. Donn's testimony. Appellants' fifth assignment of error is overruled.

By their sixth assignment of error, appellants allege that the court erred in allowing the "surprise" testimony of a defense expert witness. We do not agree.

Donna Ferriero, M.D., a pediatric neurologist from San Francisco General Hospital, testified as an expert on appellees' behalf. Appellants took Dr. Ferriero's deposition by telephone thirteen days before trial, on February 5, 1992. Appellants' position is that Dr. Ferriero expressed an opinion during her discovery deposition that conflicted with the opinion which she expressed at trial. Appellants claim that they were prejudiced by Dr. Ferriero's testimony at trial because the court did not permit them to secure a rebuttal witness, which allegedly became necessary because of the specialized medical issues to which Dr.

Ferriero testified. Appellants also contend that appellees violated their duty to supplement discovery responses under Civ.R. 26(E)(1).

Dr. Ferriero's "surprise" testimony involved the issue of timing, that is, whether Richard sustained neurological damage during development or during the labor and delivery process. Dr. Ferriero stated the following in her deposition testimony:

"Q. But you aren't able to give us a time as to when that hypoxic ischemic injury occurred?

"A. No.

"Q. Or insult?

"A. No. It could have occurred very early prenatally, throughout the pregnancy, and including the time of, through labor and delivery. You can't say conclusively based on that post natal course what time the insult occurred.

" * * *

"Q. From your review of the records, would you agree that this child's encephalopathy [occurred] as a result of a hypoxic ischemic insult that occurred intrapartum?

"A. No.

"Q. And could you explain why you would—

"A. I can't say when the, I would agree that this child's damage is consistent, and subsequent neonatal course is consistent with hypoxic ischemic encephalopathy. I cannot agree with when, I cannot conclude from anything that I have seen when that insult occurred, whether it was intrapartum or prepartum."

Dr. Ferriero stated the following during her trial testimony:

"Q. Based on all of that information, have you been able to determine a period of time during which the injury occurred?

"A. Using the examination as recorded in the nurses notes, it appears that there's a frame of reference for this type of injury that the baby suffered, and it would lead me to conclude that the baby suffered intrauterine damage, not perinatal or birth damage.

"Q. By intrauterine, do you refer to the period of time before labor and delivery?

"A. Yes.

"Q. Are you able to determine based on all of that information any more specifically when it occurred beyond intrauterine?

"*A.* You can't name the date and time given the data that we have. All we can reasonably conclude is that the baby—for a baby to present with that kind of neurological picture, the baby had to have been damaged during gestation and not in the immediate hours before delivery."

One of the key issues in the present case was whether Richard sustained neurological damage while developing or during labor and delivery. With this in mind, it does appear that Dr. Ferriero was unable to render an opinion regarding the timing issue during her deposition yet did provide such an opinion during her trial testimony. Despite this apparent inconsistency, for the reasons that follow, we cannot conclude that appellants were prejudiced by the allowance of Dr. Ferriero's trial testimony on the timing issue.

First, appellants had sufficient opportunity to impeach Dr. Ferriero on cross-examination. In fact, appellants questioned Dr. Ferriero in detail concerning her deposition testimony. Dr. Ferriero responded to appellants' questions with a reasonable explanation as to why she felt her deposition and trial testimonies were consistent.

Second, appellants could not have been surprised by the testimony on the timing issue as that issue was the central causation question at trial. Also, another defense expert witness who testified before Dr. Ferriero, Harlan Giles, M.D., testified that in his opinion Richard's neurological injury did not occur during labor and delivery.

Third, there is simply no evidence that appellees deliberately attempted to mislead appellants regarding the substance of Dr. Ferriero's testimony. Appellees were obligated under Civ.R. 26(E)(1) to notify appellants of changes or additions in the *subject matter* of Dr. Ferriero's testimony, but not "each and every nuance" of her testimony. See *Tritt v. Judd's Moving & Storage, Inc.* (1990), 62 Ohio App.3d 206, 574 N.E.2d 1178; *Beavercreek Local Schools v. Basic, Inc.* (1991), 71 Ohio App.3d 669, 595 N.E.2d 360. Through discovery and pretrial statements appellants were well aware that Dr. Ferriero would testify on causation issues. Accordingly, appellees did not violate their duty to supplement discovery response. For all of these reasons, the trial court did not abuse its discretion in allowing Dr. Ferriero's testimony and appellants' sixth assignment of error is overruled.

By their seventh assignment of error, appellants argue that the trial court erred in barring the videotaped rebuttal testimony of Dr. Donn, who testified live in court during appellants' case in chief. Appellants contend that this rebuttal testimony was necessary to counter Dr. Ferriero's "surprise" testimony. We find that the trial court acted properly.

In the present case, because of a scheduling conflict which prevented Dr. Donn from returning to Ohio, appellants offered to present Dr. Donn's rebuttal testimony via a live satellite connection. As a precaution, the trial judge ordered the rebuttal testimony videotaped outside the jury's presence. Appellants describe the videotaping as a "reasonable and fair consideration." After Dr. Donn's rebuttal testimony was videotaped, the trial court ruled it inadmissible, finding that the Civil Rules do not permit either live satellite testimony or videotaped trial testimony.

Appellants rely on Civ.R. 40 in arguing that the court should have allowed the jury to view Dr. Donn's videotaped rebuttal testimony. Civ.R. 40 governs prerecorded testimony and states as follows: *"All of the testimony* and such other evidence as may be appropriate may be presented at a trial by videotape, subject to the provisions of the Rules of Superintendence." (Emphasis added.) The Staff Notes following Civ.R. 40 elaborate:

"[N]ew Rule 40 * * * provides that 'all' of the testimony and 'such other evidence as may be appropriate'—a demonstration of some mechanical process or medical procedure, for example—may be presented 'at a trial by videotape.' In short, Rule 40 is an enabling rule making possible the recording of all trial testimony on videotape for later presentation to a jury. A videotape trial, however, may be conducted only in conformity with the Rules of Superintendence, i.e., Sup.R. 15 [now C.P.Sup.R. 12 and M.C.Sup.R. 10]."

In addition, C.P.Sup.R. 12 states that "[i]n videotape trials, videotape is the exclusive medium of presenting testimony irrespective of the availability of the individual witness to testify in person."

■ As the above language demonstrates, Civ.R. 40 permits videotaped testimony to be presented at trial only when all of the trial testimony is videotaped. It arguably follows, then, that the rule does not sanction a piecemeal approach where a portion of trial testimony is presented to the jury live in court and a portion is prerecorded. We note that videotaped depositions are a permissible discovery technique under Civ.R. 30(B)(3) and that they may be played at trial under Civ.R. 32 if certain procedural requirements are met. The Ohio Civil Rules, however, do not expressly permit an individual trial witness to testify via either a live satellite connection or a prerecorded videotape.

■ We are also persuaded by the fact that during his rebuttal testimony, Dr. Donn admitted that he was repeating his testimony from direct and cross-examination. In addition, although appellants state that Dr. Donn's videotaped testimony was necessary to rebut Dr. Ferriero's trial testimony, appellants' questioning of Dr. Donn during rebuttal pertained only to Dr. Giles' trial testimony. Therefore, it is questionable whether Dr. Donn's testimony was

proper rebuttal evidence. See *Nickey v. Brown* (1982), 7 Ohio App.3d 32, 7 OBR 34, 454 N.E.2d 177. Ultimately, though, decisions on the admissibility of individual testimony are within the discretion of the trial judge. *Berry v. Motorists Mut. Ins. Co.* (1983), 13 Ohio App.3d 228, 13 OBR 280, 468 N.E.2d 922. Because the Civil Rules arguably do not provide for the presentation of expert trial testimony by live satellite or videotape and because Dr. Donn's rebuttal testimony mirrored that given by him at trial, we cannot conclude that the trial judge abused his discretion in barring the rebuttal testimony.[8] Appellants' seventh assignment of error is overruled.

By their eighth assignment of error, appellants contend that the trial court overemphasized appellants' burden of proof when instructing the jury. We do not agree.

Because of the complex nature of this case, the trial court issued detailed written and oral instructions to the jury. We have reviewed both the written instructions and the transcript of the oral instructions and can find no indication that the instructions prejudiced appellants. The court correctly and thoroughly explained to the jury the elements of a medical malpractice action, all of which were correct statements of the law. The court also admonished the jury at the beginning of trial and again prior to issuing the instructions, warning that when "any principle or idea is repeated or stated in varying ways, no emphasis thereon is intended, and none should be inferred." We find nothing in the jury instructions implying that appellants' burden of proof was greater than a preponderance of the evidence. Appellants' eighth assignment of error is overruled.

By their ninth assignment of error, appellants allege that the trial court failed to properly instruct the jury on the issue of apportionment. We do not agree.

Appellants' argument stems from the holding in *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313, which states in pertinent part as follows:

"Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon such actor." *Id.* at paragraph six of the syllabus.

---

8. Our analysis should not be construed to mean that a trial judge may never, in her discretion, properly admit testimony by the means attempted by appellants in the case at bar. See *Ferrante by Ferrante v. Ferrante* (1985), 127 Misc.2d 352, 485 N.Y.S.2d 960; *In re San Juan Dupont Plaza Hotel Fire Litigation* (D.P.R.1989), 129 F.R.D. 424.

The initial determination of whether an injury is capable of apportionment is a question of law for the trial court. *Id.* at 197, 559 N.E.2d at 1323, fn. 4; Restatement of the Law 2d, Torts (1965), Section 434(1)(b); *Mitchell v. Volkswagenwerk* (C.A.8, 1982), 669 F.2d 1199. Thus, while the plaintiff in a medical malpractice action has the burden of proving negligence, the defendants have the burden of proving apportionment if they wish to avoid joint and several liability.

In the present case, appellants argue that the trial court erred in not instructing the jury that appellees had the burden of apportioning the harm between them. What appellants neglect to mention, however, is that they requested a directed verdict on the apportionment issue at the close of appellees' case, asking that the jury be instructed on joint and several liability because appellees had not presented sufficient evidence of apportionment. The court granted the directed verdict. It found that appellees failed to show that Richard's injury was capable of apportionment between them.

Because the trial court took the apportionment issue from the jury by granting a directed verdict, appellants cannot now complain that they were prejudiced by a lack of an apportionment instruction to the jury. Regardless, the court did address apportionment in its instructions. Specifically, the court stated: "Now if your verdict is for the plaintiff, the plaintiff has no burden to apportion the harm to Ricky Sowers between the defendants. If you return a verdict in favor of the plaintiff, each defendant who[m] you find against will be liable for the entire judgment." In light of this language, we find that the court properly charged the jury on liability. Although it is not clear whether the above oral instruction was included in the written instructions submitted to the jurors, because apportionment was not a jury question in the present case, any inconsistency between the two sets of instructions is insignificant. Appellants' ninth assignment of error is overruled.

■ By their tenth assignment of error, appellants propose that the jury verdict in the instant case was *against the manifest weight of the evidence.* We do not agree.

■ When analyzing whether a jury verdict is against the manifest weight of the evidence, the court of appeals must presume that the jury's findings were correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 10 OBR 408, 461 N.E.2d 1273. " 'Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id.* at 80, 10 OBR at 411, 461 N.E.2d at 1276, quoting *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.

After carefully reviewing all of the evidence presented in the case at bar, we conclude that the jury verdict in favor of appellees was supported by competent, credible evidence. For example, Drs. Kah, Swisher, Perkins, and Oches described their treatment of Richard and explained their reasons for choosing a particular course of action. Drs. Giles and Ferriero presented opinions that Richard suffered neurological damage prior to birth, during development. Dr. Clarence McLain, an obstetrician, gynecologist and professor at the University of Cincinnati College of Medicine, testified that Dr. Kah did not violate the appropriate standard of care. Additionally, Dr. Ferriero testified that Richard received the proper care for his neurological condition at Middletown Hospital. Dr. Ferriero also stated that Richard's neurological problem was already present at the time he was treated by Drs. Swisher, Perkins and Oches and that the care rendered by those pediatricians did not cause or contribute to Richard's neurological outcome. All of the defense expert witnesses based their opinions on some combination of the various hospital records, radiologic records and images, and depositions available in the case. The jurors were provided with copies of Richard's medical records, which they were able to utilize as each expert testified. Based on the evidence presented by the defense during the two-and-one-half-week trial, this court is convinced that the jury verdict in favor of appellees was not against the manifest weight of the evidence. Appellants' tenth assignment of error is overruled.

By their eleventh and final assignment of error, appellants contend that the cumulative weight of the errors committed by the trial court necessitates a new trial. However, because we have overruled each of appellants' ten previous assignments of error, the final assignment is moot and is hereby overruled. See App.R. 12(A).

*Judgment affirmed.*

KOEHLER, P.J., and HOFSTETTER, J., concur.

EDWIN T. HOFSTETTER, J., retired, of the Eleventh Appellate District, sitting by assignment.