JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff Jimmy Mullet (this case was incorrectly filed under the name "Mullett") brought suit against his employer, the Wheeling Lake Erie Railway Company ("the railway"), alleging that one of its employees negligently exploded a safety device near his ear, causing him to suffer tinnitus, or a permanent ringing in his ears. A jury found in Mullet's favor and awarded him $102,200. The railway appeals.
 {¶ 2} The facts relating to the accident were undisputed at trial. One of Mullet's coworkers tried to play a practical joke on a third coworker by clandestinely placing a "torpedo" on a turntable track. Contrary to the shape suggested by its name, the torpedo is a small packet which contains an explosive charge that detonates loudly when a train wheel runs over it. The torpedo is designed to give locomotive engineers warning of a possible problem down the track. As a practical joke, the loud explosion is intended to scare an unsuspecting victim. The jokester missed his intended victim, however, because Mullet operated the turntable before the victim. The torpedo exploded just ten feet away from him, and the loudness of the explosion damaged Mullet's hearing.
 {¶ 3} Mullet immediately reported the incident to his supervisor, but said that he did not need medical attention. Three days later, Mullet changed his mind, reporting that he had hearing problems from the incident. The railway referred him to a company doctor. This doctor conducted a hearing test and prescribed steroids, and in turn referred Mullet to an ear specialist.
 {¶ 4} This was not Mullet's first problem with his ears. A series of hearing tests conducted between 1989 and 1996 showed that Mullet had suffered noise-induced hearing loss from his job in the rail yards. When he saw the specialist, however, his low and mid-frequency hearing loss resulting from the incident had returned to normal, while his high-frequency loss remained consistent with levels that preexisted the explosion. An examination note dated October 19, 1999, written nearly one month after the explosion, failed to indicate that Mullet complained of tinnitus. In fact, Mullet did not complain to the specialist of tinnitus until April 6, 2000. Testimony showed that tinnitus sometimes cannot be verified objectively, and this was the case with Mullet, as his own doctor admitted that he could not say from his own knowledge whether Mullet suffered from tinnitus.
 I {¶ 5} The railway's first collection of arguments relates to various evidentiary rulings made by the court, all of which the railway claims excluded relevant evidence.
 A {¶ 6} As a basic principle, all relevant evidence is admissible, unless the probative value of that evidence is substantially outweighed by its prejudicial effect. See Evid.R. 403. "Relevant" evidence is defined as evidence having any tendency to make a fact of consequence to the determination of the action more or less probable than it would be without the evidence. See Evid.R. 401. The parties correctly note that our standard of review on the admission of evidence is whether the court abused its discretion. See Evid.R. 104; Krischbaum v. Dillon (1991),58 Ohio St.3d 58, 66.
 B {¶ 7} The railway complains that the court erred by refusing to permit it to inform the jury that Mullet had filed and settled a lawsuit against a prior employer on grounds that conditions of employment caused his hearing loss. Mullet worked as a railroad mechanic for thirty years, and in 1990 worked for Norfolk Western, the predecessor company to Wheeling Lake Erie. In 1993, he filed an action against Norfolk Western in which he alleged that he suffered hearing loss as a result of his employment. He settled the claim for $6,000. Prior to trial, the railway informed the court that it wished to introduce evidence of this settlement at trial to show (1) that Mullet had been compensated for his injuries and (2) that Mullet's preexisting, noise-induced hearing loss was the likely cause of the tinnitus. The court denied the request, saying that while Mullet's hearing loss prior to the incident in question was relevant, his settlement with Norfolk Western was not. The railway claims the court abused its discretion by excluding evidence of the settlement.
 {¶ 8} There is no dispute that any evidence relating to Mullet's preexisting hearing loss would have been relevant. Such evidence is often admitted for purposes of countering a claim for aggravation of a preexisting injury. See Tonti v. Morrison (1971), 29 Ohio App.2d 273;Barbalics v. Kohout (May 23, 1996), Cuyahoga County App. No. 69140. The parties very thoroughly documented Mullet's prior hearing loss, so this is not an issue at trial.
 {¶ 9} The problem arose because the railway tried to present evidence of Mullet's prior settlement in addition to his admitted prior hearing loss. We can foresee some circumstances when this type of evidence might be admissible, but this is not such a case. Mullet's claim of tinnitus presented an entirely new complaint about his hearing. Nothing in Mullet's prior action against Norfolk Western related to tinnitus. It is true that the railway's expert gave his opinion that Mullet's tinnitus was caused by Mullet's chronic and irreversible noise-induced hearing loss which predated the incident. Nevertheless, the railway's expert was forced to concede that Mullet might not have suffered from tinnitus prior to the incident. While the expert thought it highly unlikely that Mullet did not suffer from tinnitus before the incident, he agreed that it was possible. Given this inability to make any kind of opinion to a medical certainty, the only thing that seems certain to us is that evidence of a prior settlement would have distracted the jury in its fact-finding to determine whether Mullet's tinnitus arose from the incident. Jury distraction alone would have been an adequate basis for excluding the evidence. See Evid.R. 403(A).
 {¶ 10} This is not the kind of case where evidence of other accidents would be relevant to establishing one's knowledge of a dangerous condition or defect. See Renfro v. Black (1990),52 Ohio St.3d 27, 31 (evidence of prior accidents is only admissible for the purpose of supporting the element of knowledge if "the proponent of the evidence shows that the accidents occurred under circumstances substantially similar to those at issue in the case at bar."). Nor did the railway intend to use the existence of the settlement to impeach Mullet; for example, had he denied ever suffering from hearing loss.
 {¶ 11} In the end, it seems to us that the railway sought to use the existence of the settlement to suggest to the jury that Mullet was an opportunist. There was something to this suggestion, as Mullet failed to complain about any tinnitus until months after the incident and, although diagnosed with a hearing loss, admitted he rejected or disregarded his doctor's advice to wear hearing protection while firing shotguns or engaging in other activities which created conditions that might further damage his hearing.
 {¶ 12} Despite this evidence, the railway's attempt to paint Mullet as an opportunist is expressly barred by Evid.R. 404(B). The rule states that evidence of other "* * * acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The railway's attempt to use the existence of one prior lawsuit related to his hearing would have been a very transparent attempt to show that Mullet was litigious. This attempt is plainly barred by Evid.R. 404(B) because it would have tried to establish that he acted in conformity therewith. And even if this wasn't the railway's primary purpose, the other acts evidence was so susceptible of being misconstrued for that purpose that the court did not abuse its discretion by excluding it.
 {¶ 13} This is not to say that evidence of prior litigation would never be admissible under Evid.R. 404(B). The rule expressly notes that other acts evidence might be admissible for "other purposes" and had Mullet denied ever having hearing problems, the other acts evidence would have been allowable to impeach that denial. In addition, had Mullet filed a series of lawsuits related to his hearing problems, the results of those lawsuits might be admissible to show a pattern of fraudulent lawsuits. See Gastineau v. Fleet Mortgage Corp. (C.A. 7, 1998),137 F.3d 490, 495-496. But neither of these other purposes are present here.
 {¶ 14} We find the court did not abuse its discretion by refusing to permit the jury to hear the results of Mullet's 1993 lawsuit.
 C {¶ 15} The railway next argues that the court abused its discretion by refusing to permit it to introduce evidence that Mullet's specialist suffered from tinnitus. It argues that the specialist's condition was relevant to his credibility because it implicated whether "his life has been affected" by the tinnitus.
 {¶ 16} An expert, like any other witness, is subject to cross-examination on "all relevant matters affecting credibility." See Evid.R. 611(B); Susanu v. Cliche (2001), 143 Ohio App.3d 776, 778. One basis for impeachment is bias or interest in an outcome. See Evid.R. 616(A). The Ohio Supreme Court has greatly enlarged the grounds for impeachment, holding for example that a commonality of insurance interests is sufficiently probative of an expert's bias as to outweigh any potential prejudice accruing from the jury's knowledge that a defendant owned liability insurance. See Ede v. Atrium S. OB-GYN, Inc. (1994), 71 Ohio St.3d 124, syllabus. And in Oberlin v. Akron Gen. Med.Ctr., 91 Ohio St.3d 169, 2001-Ohio-248, the court held that a medical expert in a malpractice action who himself is the subject of a pending medical malpractice claim can be impeached with evidence of that malpractice claim against him.
 {¶ 17} Certainly, an expert's direct pecuniary interest in a matter will be grounds for impeachment because it is a tangible interest. Tangible interests are readily grasped by jurors without bringing up the possibility of confusing the jury with tangential issues. But the railway's offered use of impeachment was far more subtle. It wished to suggest that the specialist made his diagnosis of tinnitus solely because he himself suffered from the same condition.
 {¶ 18} We say it was a subtle attempt because the transcript of the specialist's deposition (which was used in lieu of his live testimony at trial), did not show any in-depth questioning on the subject of bias. The questions merely asked the specialist whether he currently suffered from tinnitus (yes) and whether the tinnitus was something that disabled him (no). From these two questions the railway now claims it could have shown bias. We disagree. A medical expert's acknowledgment of suffering from the same or similar condition as the subject of his expert report is not necessarily probative of bias. It is not uncommon for persons to share afflictions. Even medical doctors get sick or hurt. But that information, standing alone, cannot be enough to establish an abuse of discretion here, particularly when the risk of juror confusion over the use of the impeachment is great. Admittedly, the expert's concession that he suffered from tinnitus might have made him more aware of that affliction when making a diagnosis of tinnitus for another person, but nothing in the testimony goes so far as to show that he rendered a diagnosis purely on sympathetic grounds. The court did not abuse its discretion by refusing to permit this testimony.
 D {¶ 19} During recross-examination of the specialist, the railway asked several questions relating to "secondary gain." The court excluded those questions when the specialist's videotaped deposition was played to the jury. The railway argues that Mullet opened the door to the questions and therefore the court abused its discretion by excluding them.
 {¶ 20} "Secondary gain" is defined as "an advantage accruing subsequent to an illness or accident, which plays a part in creating and/or perpetuating" that illness or injury. See Keiser (1968), The Traumatic Neurosis, quoted in Shuman, When Time Does Not Heal: Understanding the Importance of Avoiding Unnecessary Delay in the Resolution of Tort Cases (2000), 6 Psych.Pub.Pol.L. 880, 887, fn. 31. In layman's terms, secondary gains are considered to be social advantages such as attention, assistance or sympathy that one gains from having an illness. See Loza v. Apfel (C.A. 5, 2000), 219 F.3d 378, 383, fn. 8. As used by the railway in this case, a reference to Mullet's attempt for a secondary gain would suggest that the tinnitus was prompted by a desire for additional compensation for a preexisting medical condition.
 {¶ 21} During redirect examination of Mullet's expert, counsel asked the following question:
 {¶ 22} "If you assume that prior to September 24, 1999, Mr. Mullet had virtually no tinnitus or ringing in his ears that he describes now and that subsequent to September 24, 1999, he describes ringing in his ears to the — to the effect that it sounds like the hum of a television after it's turned off or after the station goes off, okay. And the only intervening factor that we know of — I'm sorry, and we know of this explosion on September 24th, is there anything that you've seen that is there that indicates he, in fact, had tinnitus prior to September 24th?"
 {¶ 23} The specialist replied "no."
 {¶ 24} On recross-examination, the expert agreed that he placed a "a lot of credence" in a patient's subjective complaints. The railway's counsel then asked the expert to suppose a patient whose words (or subjective complaints) were inconsistent with his actions. In response to the question of which would he follow, either the patient's descriptions or his objective behavior in manifesting a condition, the expert replied that if he knew that the patient was psychotic and not behaving normally, he would pay more attention to the behavior and not the patient's words. The railway's counsel then said while "nobody is suggesting that Mr. Mullet is psychotic, but does the medical profession recognize the term secondary gain?" Mullet's counsel objected that the question exceeded the scope of redirect examination. The court agreed and struck the testimony.
 {¶ 25} The court did not abuse its discretion by refusing to permit the recross-examination on grounds that it exceeded the scope of redirect examination. The railway's only argument is that Mullet opened the door to secondary gain. Having considered the substance of the question asked by Mullet's counsel, we fail to see how secondary gain could have been raised on redirect examination. Although the question asked by Mullet's counsel was not a model of clarity, it distilled to this: had the expert seen anything to indicate that Mullet had tinnitus prior to September 24, 1999. Under no stretch of the imagination could the concept of secondary gain be derived from the question and answer. That question had not been considered in any respect prior to that point. In short, it went well beyond the scope of redirect examination and the court did not abuse its discretion by restricting the scope of recross-examination. State v. Faulkner (1978), 56 Ohio St.2d 42, 46.
 F {¶ 26} During trial, the railway tried to show that Mullet had caused his own condition by firing shotguns after the torpedo incident. To that end, it tried to qualify as an expert witness one of its employees who would have testified that the sound of a shotgun blast exceeded that of a torpedo. The railway submitted that this employee not only had a familiarity with exploding torpedoes, but had been a combat engineer in the armed forces, with training in explosives and mines. The court refused to let the employee testify as an expert, and the railway maintains that the court abused its discretion by doing so.
 {¶ 27} Evid.R. 702 permits a person to testify as an expert if the proposed witness will give testimony that is beyond the knowledge or experience possessed by laypersons, or if the person has some specialized knowledge, skill, experience or training on the subject of the testimony. As with the other evidentiary matters discussed so far, the court's decision to qualify a person as an expert is subject to review only for an abuse of discretion. See State v. Maupin (1975),42 Ohio St.2d 473, 479.
 {¶ 28} One of the primary reasons for permitting expert testimony is to replace subjectivity with objectivity. Had the railway really wanted to quantify the loudness of the shotgun, it would have been a simple matter to obtain the services of an expert in the field of sound transmissions. This kind of expert could measure the decibel level of the two sounds and present the objective data to the jury. Decibel readings would have been pure expert evidence, because it would be given without subjectivity. Instead, the railway chose to rely on the experience of one of its own employees, a person whom the jury most likely would have considered partial by virtue of his employment with the railway. The railway offered no proof that its witness would have been able to take into account the acoustics present at the time of the incident, all of which rely on variables such as wind, weather conditions and materials that may have blocked or amplified the sound.
 {¶ 29} To be sure, this is not the kind of case where the noise complained of could be considered de minimus. The evidence showed that the torpedo is designed to be loud enough to be heard over the engine noise of a locomotive. Mullet was only ten feet away from the torpedo at the time it exploded. And in any event, the sound of an exploding torpedo is loud enough that the workers in the yard knew that they could startle an unsuspecting victim. But in the end, the railway's worker would not have offered any particular help to the jury by virtue of his training or experience. We acknowledge that the evidence also showed that Mullet fired shotguns without ear protection. But he also testified that the sound of the exploding torpedo exceeded that of the shotgun. It was his opinion that mattered, unless contradicted by more quantifiable evidence than that offered by the railway.
 {¶ 30} We are troubled, however, with the court's decision to forbid the employee from testifying as a rebuttal lay witness on the same subject. To the extent that Mullet testified that the exploding torpedo was the "loudest" sound he had ever heard, the railway was entitled to present witnesses who would give contrary testimony. Nevertheless, we fail to see how the exclusion of this type of evidence would have prejudiced the railway. It only complains of one witness, and that testimony would have been largely cumulative to that which pointedly showed Mullet's failure to utilize hearing protection while firing his shotgun. The point about Mullet's prior hearing loss had been well-made to the jury, so we cannot find that the improper exclusion of evidence relating to the loudness of the torpedo explosion would have affected the outcome of trial.
 II {¶ 31} The issue raised on appeal deals with the court's jury instructions. The railway argues that the court erred by refusing to instruct the jury on contributory negligence.
 {¶ 32} The Federal Employee Liability Act ("FELA"), Title 45 U.S. Code, provides that contributory negligence by an employee is not a defense to the employer's negligence, but can affect the amount of damages awarded. Section 53 of FELA states:
 {¶ 33} "In all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this act to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, that no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."
 {¶ 34} The court did not give any instruction on contributory negligence, even though the railway offered a specific instruction on contributory negligence as required by Civ.R. 51(A) on grounds that the evidence showed that Mullet had disregarded medical advice to wear ear protection and fired shotguns in very close proximity to his ears. The question is whether the court abused its discretion by refusing to give the requested instruction.
 {¶ 35} The general rule is that the court should give a jury instruction if it is an accurate statement of the law applicable to the facts presented at trial and reasonable minds might reach the conclusion sought by the instruction. See Murphy v. Carrollton Mfg. Co. (1991),61 Ohio St.3d 585, 591.
 {¶ 36} The railway elicited Mullet's own concession that he had been told to wear ear protection and refused to do so. Mullet also agreed that he fired shotguns after the incident, but denied that he had done so with frequency. Finally, Mullet said that his primary hobby was repairing and maintaining his automobiles. All of these factors could well have convinced a jury that Mullet's own actions contributed to his hearing loss, particularly when Mullet did not complain about tinnitus until months after the incident. In fact, just days after the incident, Mullet characterized his own hearing as "good."
 {¶ 37} The problem with the railway's position, however, is that none of this evidence shows that Mullet was contributorily negligent in the incident. In fact, the evidence shows the opposite, as Mullet was the unintended victim of a practical joke. Nothing he did on the day of the incident contributed in the least to his own injury — he was blameless. What the railway appears to be arguing is that the incident was not the proximate cause of Mullet's tinnitus; rather, Mullet either had preexisting tinnitus or his tinnitus was caused by his failure to wear ear protection and his shooting a shotgun. Proximate cause is not the same as contributory negligence, and this is very clearly the case when considering contributory negligence for FELA. The court did not err by refusing to instruct the jury on contributory negligence as an aspect of the FELA claim.
 III {¶ 38} The final set of arguments relate to various post-trial claims that the court rejected.
 A {¶ 39} The railway first argues that the court erred by denying a motion for a new trial on grounds that the jury foreman, an attorney, failed to disclose during voir dire that he had prosecuted a civil claim in federal court in which the law firm representing the railway had acted as defense counsel for another client. During voir dire the foreman replied "no" to the question whether he had, by any chance encountered "anybody over the years from Gallagher, Sharp?" In a motion for a new trial, the railway offered an affidavit from one of its defense counsel's attorneys to the effect that the foreman had litigated an age discrimination case in federal court in which the railway's law firm represented one of the defendants. The foreman did not dispute the attorney's recollection, but explained that he had, over the years, litigated "literally hundreds of matters with at least several hundred attorneys on the opposite side," and that he could not recall the details of each case nor the identity of all attorneys and their law firms. He maintained that he had been unaware that he had prosecuted a case against an attorney from the same firm that represented the railway, and he asserted that he kept an open mind and exerted no influence on the other jurors, other than to participate in normal jury deliberations.
 {¶ 40} Under Civ.R. 59(A)(2), the misconduct of a juror may be grounds for a new trial. When it is alleged that a juror committed misconduct by failing to divulge material information in response to voir dire, "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." See McDonough Power Equip., Inc. v. Greenwood
(1984), 464 U.S. 548, 556. The court's decision to deny a motion for a new trial is reviewed for an abuse of discretion. Savage v. CorrelatedHealth Serv., Ltd. (1992), 64 Ohio St.3d 42, 47; Sowers v. MiddletownHospital (1993), 89 Ohio App.3d 572, 584-585.
 {¶ 41} Although the foreman was forced to concede that he had not given an accurate response in voir dire, we nonetheless find that the railway failed to show any prejudice. The foreman's affidavit demonstrated that he acted impartially when serving as a juror, and the railway offers nothing to prove him wrong. In fact, the railway's only real argument about prejudice is that Mullet successfully challenged for cause another attorney who said that the company he worked for regularly employed the railway's counsel. The distinction between the two situations is manifest — the foreman handled one case five years prior to the trial in this case, while the attorney who had been challenged for cause said that the railway's law firm "regularly" handled cases for his company. We cannot find that the court abused its discretion in denying the motion for a new trial solely because an attorney failed to recall that five years earlier he had litigated a case in which the railway's law firm acted as counsel for one of at least two codefendants.
 {¶ 42} The court's discussion in Pearson v. The Gardner CartageCo., Inc. (1947), 148 Ohio St. 425, is particularly apt. After the jury decided the case adversely to him, Pearson filed a motion for a new trial in which he offered proof that some of the jurors had failed to disclose during voir dire that they or family members had been involved in certain accidents or claims. In affirming the trial court's refusal to grant a new trial, the supreme court quoted from the trial judge's remarks:
 {¶ 43} "It has become a new form of indoor sport for plaintiffs, and, or, defendants after the rendering of an adverse verdict to them to start on a quiet search in an effort to discover some failure upon the part of one or more of the jurors to disclose a prior accident which has grown very hazy in their memory." Id. at 77.
 {¶ 44} The railway's argument strikes us as just such a form of "indoor sport" in response to an adverse verdict.
 B {¶ 45} For its final argument, the railway contends that the court erred by failing to order a remittitur. The jury's damage award consisted of $91,250 in future damages. The railway complains that the jury should not have made an award of future damages since Mullet did not seek damages for a shortened work-life expectancy, his hearing had returned to preexisting levels and he will require no further medical treatment for the tinnitus.
 {¶ 46} One of the bases for a new trial is "excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice." See Civ.R. 59(A)(4). Although the court has the same discretion to grant or deny a motion for excessive or inadequate damages as it does for any other reason listed under the rule, it may also give the plaintiff the option of accepting remittitur or additur.
 {¶ 47} The courts have been loathe to infringe upon the jury's province as fact finder when assessing damages. This is why Civ.R. 59(A)(4) speaks not in terms of excessive damages per se, but excessive damages brought about by passion or prejudice. To permit the courts to order a remittitur simply because the court did not agree with the amount of the jury's award would be a usurpation of the jury's function as the fact finder. A remittitur can only be ordered if the amount of damages was tainted in a legal sense; hence the requirement that there be a precipitating error — the passion or prejudice — that induced the improper damage award and thus rendered the trial unfair. The functional utility of remittitur or additur is that it preserves judicial resources by forcing the plaintiff to accept the choice of taking a lower or higher damage award or risk a different outcome in a subsequent trial, along with the delay that would necessarily ensue in waiting for retrial. See Larrissey v. Norwalk Truck Lines (1951), 155 Ohio St. 207,219; see, generally, Carlin, Remittiturs and Additurs (1942), 49 W.Va.L.Rev. 1, 3-4.
 {¶ 48} The railway's argument for remittitur was based on nothing more than the size of the damage award, with no reference to any particular facts to show that passion or prejudice played a part in the size of the award. In Fromson Davis Co. v. Reider (1934),127 Ohio St. 564, the third paragraph of the syllabus states:
 {¶ 49} "In order to determine whether excessive damages were so influenced [by passion or prejudice], a reviewing court should consider, not only the amount of damages returned and the disparity between the verdict and remittitur where one has been entered, but it also becomes the duty of such court to ascertain whether the record discloses that the excessive damages were induced by (a) admission of incompetent evidence, (b) by misconduct on the part of the court or counsel, or (c) by any other action occurring during the course of the trial which can reasonably be said to have swayed the jury in their determination of the amount of damages that should be awarded."
 {¶ 50} We have rejected all of the railway's arguments concerning possible trial error, so they could not have contributed to any passion or prejudice on the jury's part. The railway did not allege that Mullet's counsel engaged in misconduct, so that factor cannot apply. Nor can we find any other action occurring during trial which could be said to have reasonably swayed the jury.
 {¶ 51} With the absence of any specific facts showing why the award was the product of passion and prejudice, we cannot say that the court abused its discretion by denying the railway's request for remittitur. And even were we to review the evidence supporting the award, would be compelled to affirm because the award of future damages was most likely based on Mullet's testimony that the tinnitus made his life miserable and that he could not expect to receive any relief from his condition in the future. The jury was free to believe this testimony and we cannot say that it was unsupported by the evidence.
 {¶ 52} The assigned errors are overruled.
Judgment affirmed.
ANNE L. KILBANE, J., and COLLEEN CONWAY COONEY, J., CONCUR.