WALKER et al., Appellants,

v.

HOLLAND, Appellee.

[Cite as *Walker v. Holland* (1997), 117 Ohio App.3d 775.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15765.

Decided Jan. 24, 1997.

*Carmine Garofalo* and *Ronald J. Maurer*, for appellants.

*Gordon D. Arnold*, for appellee.

BROGAN, Presiding Judge.

Appellants Karen S. and Tim Walker appeal from the Montgomery County Common Pleas Court's January 31, 1996 judgment entry accepting a jury verdict against them and dismissing their complaint with prejudice.

The Walkers advance three assignments of error. First, they contend that the trial court erred by excluding certain testimony from Mrs. Walker's treating physician. Next, they claim that the jury's verdict is against the manifest weight of the evidence. Finally, the Walkers argue that the trial court erred by improperly instructing the jury on the issue of damages.

The present appeal stems from a December 23, 1993, low-speed, head-on automobile accident involving Mrs. Walker and appellee Michael D. Holland. Although her abdomen did not strike the steering wheel, Mrs. Walker, who was two months pregnant at the time, testified at trial that the impact pressed her forward against the seat belt and "slammed" her against the back seat. An ambulance transported Mrs. Walker to Kettering Medical Center, where she complained of pelvic cramping and neck soreness.

In light of Mrs. Walker's complaints, the medical center staff administered x-rays and an ultrasound. Following these tests, Mrs. Walker was diagnosed with an acute cervical strain in her neck. Additionally, the ultrasound revealed a small subchorionic bleed, indicating that Mrs. Walker's placenta was separated slightly from her uterus wall. Based upon the results of Mrs. Walker's examination, the medical center staff advised her to limit her activities and follow up with Dr. James Huey, her obstetrician.

On December 27, 1993, Mrs. Walker contacted Dr. Huey's office and advised a nurse that she had "passed one blood clot." She asserted at trial that she also informed Dr. Huey's office about her continued cramping. Nothing in the doctor's records reflected a cramping complaint, however. Mrs. Walker also alleged at trial that she developed bruising around her abdominal area a day or two after the accident. No medical documentation existed to support this claim. After speaking with Mrs. Walker, a representative of Dr. Huey's office instructed

her to "take it easy" and to call back if "anything happened." The representative also told her she could increase her activity if she felt comfortable doing so.

Mrs. Walker next contacted Dr. Huey's office on January 24, 1994, for her regular pregnancy checkup. On that visit, during which Mrs. Walker did not undergo an internal examination, the examining doctor detected a normal fetal heart tone. Mrs. Walker returned to Dr. Huey's office prior to her next regular checkup, however, after experiencing heavy bleeding. During that examination on February 16, 1994, Dr. Weprin failed to locate any fetal heartbeat. Consequently, Dr. Weprin conducted an ultrasound and discovered that the fetus had died.

Thereafter, the Walkers filed a complaint on January 24, 1995, alleging that Michael Holland negligently failed to control his vehicle and struck Mrs. Walker's car. The complaint also alleged that Michael Holland was acting as an agent of his mother, Dianna, at the time of the accident. Furthermore, the complaint alleged that Dianna Holland, who was named as a defendant, negligently entrusted her vehicle to her son. The complaint, which included a jury demand, sought a judgment for Mrs. Walker against the Hollands, jointly and severally, for $250,000, plus interest and costs. In a second cause of action, the complaint sought a judgment for Mr. Walker against the Hollands, jointly and severally, for $100,000, plus interest and costs. The Walkers based this cause of action upon Mr. Walker's loss of "the services, companionship, love, affection, comforts, consortium, joys, and miscarriage of his spouse, Karen S. Walker."

On March 23, 1995, Dianna Holland filed a motion for summary judgment on the Walkers' agency and negligent entrustment claims. In response, on June 6, 1995, the Walkers voluntarily dismissed Dianna Holland as a party without prejudice. The remaining issues proceeded to trial on January 29, 1996. After hearing the evidence, the trial court directed a verdict in the Walkers' favor on the issue of Michael Holland's negligence. The trial court then submitted the issues of causation and damages to the jury, which returned a verdict for Holland. Consequently, after reviewing the jury's verdict, the trial court entered a judgment in Michael Holland's favor, and the Walkers filed a timely notice of appeal on February 27, 1996, advancing three assignments of error.

In their first assignment of error, the Walkers contend that the trial court erred by excluding Dr. Huey's testimony concerning the expansion of Mrs. Walker's subchorionic bleed. At trial, Dr. Huey had attempted to testify that a February 16, 1994 ultrasound showed that Mrs. Walker's subchorionic bleed had grown larger since her December 23, 1993 ultrasound. In the doctor's opinion, this bleed or "tear" stemmed from her automobile accident and, due to its increase in size, ultimately caused the miscarriage.

The trial court disallowed the doctor's testimony concerning his review of the February 16, 1994 ultrasound, however, as a sanction for a perceived discovery violation. Specifically, the court found that Dr. Huey's proposed trial testimony constituted a "change" from his earlier expert opinion expressed in a deposition. As a result, the trial court explained that the Walkers should have notified opposing counsel and supplemented Dr. Huey's deposition testimony. After reviewing the record and relevant case law, we agree with the trial court's ruling.

As we explained above, the emergency room staff examined Mrs. Walker on December 23, 1993, and an ultrasound revealed a small subchorionic bleed.[1] Dr. Stuart Weprin, a partner of Dr. Huey's, conducted a second ultrasound examination on February 16, 1994, after Mrs. Walker complained of heavy bleeding. The second ultrasound examination showed a dead fetus. Dr. Weprin subsequently drafted an ultrasound report detailing the results of his examination.

In subsequent deposition testimony, Dr. Huey provided the following responses to questions from the appellee's counsel, Jane Lynch, concerning the February 16, 1994 ultrasound:

"Q. Is there any indication in this report of February 16, 1994, that the small chorionic separation found December 23rd of 1993 had expanded in any way?

"A. Not on this. Doesn't—doesn't approach the subject.

"Q. Would you think that's unusual?

"A. That it didn't mention it? No.

"Q. So there's no way to tell from this ultrasound that the subchorionic tear had done anything different between December 23rd of '93 and February 16th on '94?

"A. I can't tell it from this report.

"Q. Can you tell it from any documentation?

"A. No, ma'am.

"Q. It is possible to have a pregnancy to term with the findings of a small subchorionic tear such as what was found on Karen Walker's ultrasound of December 23rd of '93?

---

1. At trial, Dr. Huey explained that he also had examined Mrs. Walker on December 21, 1993, just prior to the accident. Dr. Huey did not conduct an ultrasound during the preaccident examination, however, and he admitted at trial that he had no way of knowing what an ultrasound would have shown. Nevertheless, he opined that if Mrs. Walker's subchorionic bleed had existed prior to the accident, his examination probably would have revealed cramping, bleeding, or an irritable uterus. Dr. Huey also admitted on cross-examination, however, that he did not know "one-hundred percent" whether the subchorionic bleed existed before the accident.

"A. Yes, ma'am.

"Q. And, we—you do not know anything different about the status of that subchorionic tear from that date to the date of the miscarriage?

"A. Right.

"Q. And was there any information about its increasing in any way after the ultrasound of February 16th of '94?

"A. Unh-uh. No, ma'am."

Later, Dr. Huey noted at trial that the emergency room staff diagnosed Mrs. Walker as having a small subchorionic bleed on December 23, 1993, after her automobile accident. Dr. Huey then confirmed that his partner, Dr. Stuart Weprin, examined Mrs. Walker on January 24, 1994. He explained that Dr. Weprin's examination, which did not include an ultrasound test, detected normal blood pressure and a fetal heart beat. Next, Dr. Huey testified that Mrs. Walker returned to his office on February 16, 1994, experiencing heavy bleeding. The doctor further explained that an ultrasound test revealed a dead fetus.

At that point, Mrs. Walker's counsel attempted to question Dr. Huey concerning the February 16, 1994 ultrasound. Specifically, her attorney, Carmine Garofalo, asked: "Now, doctor, I have asked you to go back and review that ultrasound in preparation for your testimony today, correct?" After Dr. Huey responded affirmatively, defense counsel Jane Lynch objected, and the following sidebar conference took place on the record:

"LYNCH: I object to this line of questioning, your honor, because we took a discovery deposition of Dr. Huey quite some time ago. At that time he had not reviewed this. This is obviously new evidence he has reviewed and prepared for over the weekend. He had not seen the ultrasound when we took his deposition on the February ultrasound. Based on what he said during the discovery deposition and what he's done this weekend, obviously, doesn't give the defense any opportunity to not only find out what he did but also have Dr. DeVoe respond to it, so it's extremely prejudicial to find out what he did this weekend.

"GAROFALO: Judge, we've got his deposition. There was never any comment made in that deposition. I wanted to take his deposition when she did, of course, it was August something, September—to find out what his opinions were.

"LYNCH: And I asked him specifically about that ultrasound; and he said there was absolutely nothing in that ultrasound record that indicated that there was any expansion of the subchorionic tear.

" * * *

"GAROFALO: Judge, the only thing is experts do that all the time. They prepare for trial, and anything he—

"THE COURT: Then you are under a duty to notify counsel an expert has changed his opinion. Tell me what he's going to say about the—

"GAROFALO: That the subchorionic bleed has expanded.

"LYNCH: That's exactly the opposite of what he said in the testimony, specifically on page 21 of his deposition.

"GAROFALO: Let's take a look at it. All she's doing is referring to a report, judge.

"THE COURT: I think you're sandbagging.

"LYNCH: If I have any opportunity to respond, I have no idea—I asked him.

"GAROFALO: He hadn't looked at the actual report.

"LYNCH: He looked at the report.

"THE COURT: You are precluded from asking about his—the result of his review of this ultrasound.

"GAROFALO: Judge, their expert could have looked at the ultrasound. It was in existence.

"THE COURT: If you had notified them, then they could have done that.

"LYNCH: When we asked Dr. Huey, this is what we got.

"THE COURT: Do not ask him about the review."

In their brief to this court, the Walkers contend that the trial court erred by concluding that they had a duty to notify opposing counsel that their expert had changed his opinion. Furthermore, they contend that the trial court's ruling substantially prejudiced the presentation of their case in chief.

■ In support of their first assignment of error, the Walkers argue that Civ.R. 26(E), upon which the trial court apparently relied, does not apply in the present case. Specifically, the Walkers claim that Dr. Huey, as Karen Walker's treating physician, testified as a "fact" witness rather than an "expert" witness. Consequently, they contend that the supplementation-of-discovery provisions found in Civ.R. 26 are inapplicable. Additionally, the Walkers rely upon *Beavercreek Local Schools v. Basic, Inc.* (1991), 71 Ohio App.3d 669, 680, 595 N.E.2d 360, 367, in which this court found "nothing in [Civ.R. 26(E) ] that would impose a duty on a non-party witness to supplement or to correct deposition testimony."

■ We find these arguments unpersuasive. Although we agree that Civ.R. 26(E) applies only to expert witnesses, we cannot agree that Dr. Huey failed to testify as an expert. At the outset, we note that the Walkers themselves identified Dr. Huey as an expert witness in a June 6, 1995 disclosure of expert witnesses filed with the trial court and served upon the appellee's counsel. More

important, Dr. Huey's status as Mrs. Walker's treating physician does not render him incapable of acting as an expert witness. This court recently explained that a treating physician may be either a fact witness or an expert witness, depending upon the nature and scope of the physician's testimony. In *Hurst v. Poelstra* (Dec. 22, 1995), Miami App. No. 94–CA–61, unreported, 1995 WL 765968, we recognized that "where a treating physician has been properly identified as a fact witness prior to trial, the treating physician may testify as a fact witness, but may not testify as an expert as to the ultimate question unless identified as an expert witness." Similarly, in *Smith v. Stark Cty. Neurologists, Inc.* (Jan. 7, 1991), Stark App. No. CA–8152, unreported, 1991 WL 6273, the appellees attempted to circumvent Civ.R. 26(E) by characterizing three physicians as "occurrence" witnesses rather than "experts." The Fifth District Court of Appeals rejected the argument, however, stating: "All three doctors treated the child, and each did testify regarding his involvement in the little boy's care. Each gave opinions that cannot in any sense be considered lay opinions. Each gave opinions reaching beyond his own involvement in the case, encompassing the care given by other doctors, and addressing the ultimate issues of negligence and proximate cause. Although there may at times be a fine line between factual responses and expert opinion responses elicited from a witness, here there is no doubt as to the nature of these doctors' responses. Calling them occurrence witnesses does not make them occurrence witnesses. Appellee's argument that these witnesses did not testify as experts would be ludicrous if it did not so blatantly insult this court's intelligence."

Likewise, in *Gillespie v. Iler* (May 6, 1996), Van Wert App. No. 15–95–8, unreported, 1996 WL 255881, the Third District Court of Appeals affirmed a trial court's decision not allowing the appellant's witness, a treating physician, to testify as an expert at trial. In its ruling, the appellate court noted that "[h]ere, the trial court did not allow [the appellant's] witness, Dr. Metry, to testify as an expert medical witness because [the appellant's] counsel did not timely notify the court or opposing counsel that Metry would be testifying as an expert. However, the trial court did allow Metry to testify as a fact witness because he treated Bernice during her illness."

In light of the foregoing authorities, we reject the Walkers' argument that "[a]s the plaintiff's treating physician, Dr. Huey was not technically an 'expert witness' although he was asked some expert opinions during his trial testimony." In our view, the crucial factor when determining Civ.R. 26(E)'s applicability is the substance of Dr. Huey's testimony and not his status as a "treating physician." In the present case, the record reveals that Dr. Huey's testimony concerned, *inter alia,* the origin of Mrs. Walker's subchorionic bleed and its causal effect on her miscarriage. The Walkers concede, and we agree, that this testimony

included "some expert opinions." Accordingly, we find Civ.R. 26 applicable to Dr. Huey's testimony.

Furthermore, this court's ruling in *Beavercreek Local Schools v. Basic, Inc., supra,* upon which the Walkers rely, does not render Civ.R. 26(E) wholly inapplicable to Dr. Huey's deposition testimony and later trial testimony. In that case, we construed Civ.R. 26(E), which provides, in relevant part:

"Supplementation of Responses. A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:

"(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters, and (b) the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify.

"(2) A party who knows or later learns that his response is incorrect is under a duty seasonably to correct the response."

In *Beavercreek Local Schools v. Basic, Inc., supra,* the appellant alleged that the appellee's expert witness, Dr. Corn, provided incomplete deposition responses. Consequently, the appellant argued that the appellee had an obligation, under Civ.R. 26(E), to supplement Dr. Corn's answers. *Id.,* 71 Ohio App.3d at 679, 595 N.E.2d at 366–367. This court rejected the appellant's argument, however, holding that the appellee "was under no duty pursuant to Civ.R. 26(E) to supplement its expert witness' response to questions asked during the deposition." *Id.* at 680, 595 N.E.2d at 367. In support of our ruling, we recognized that "the duty seasonably to supplement responses to discovery is addressed to parties, not non-party witnesses." *Id.* Furthermore, we noted our inability to find anything in Civ.R. 26(E) "that would impose a duty on a non-party witness to supplement or to correct deposition testimony." *Id.*

At the same time, however, Civ.R. 26(E)(1)(b) expressly requires a party to supplement responses concerning (1) the identity of persons expected to testify as expert witnesses and (2) the subject matter of the experts' testimony. *Id.* Thus, under the rule, the Walkers did maintain a duty to inform the appellee of changes in the *subject matter* of Dr. Huey's testimony. Consequently, the central issue for our consideration is whether the subject matter of Dr. Huey's proposed trial testimony differed from the subject matter of his deposition testimony. If so, Civ.R. 26(E)(1)(b) compelled the Walkers to inform the appellee of the change.

In their brief to this court, the Walkers contend that the subject matter of Dr. Huey's testimony did not change. Initially, they assert that the appellee's counsel never questioned Dr. Huey about the February 14, 1996 ultrasound itself. Instead, they claim that appellee's counsel questioned Dr. Huey only about the ultrasound report, which Dr. Stuart Weprin prepared. They stress that the report did not mention any expansion of Mrs. Walker's subchorionic bleed. Thus, the Walkers contend that Dr. Huey answered the deposition questions accurately.

Furthermore, given their assertion that the appellee's counsel never inquired about the ultrasound itself, the Walkers insist that they maintained no obligation to supplement discovery and disclose Dr. Huey's belief, based upon his pretrial review of the ultrasound, that Mrs. Walker's subchorionic bleed had expanded. Additionally, the Walkers argue that even if Dr. Huey had changed his opinion, a simple issue of credibility would arise for the trier of fact to resolve.

Conversely, appellee Holland contends that the trial court properly excluded Dr. Huey's proffered testimony concerning the expansion of Mrs. Walker's subchorionic bleed. In support of his argument, Holland claims that Dr. Huey, in his deposition testimony, expressly denied having any knowledge or opinion that the subchorionic "tear" or bleed had increased. Consequently, Holland asserts that the trial court properly prevented Dr. Huey from testifying differently at trial based upon his undisclosed pretrial review of the February 16, 1994 ultrasound.

After reviewing Dr. Huey's deposition testimony, his proposed trial testimony, and relevant case law, we conclude that the trial court properly rejected the proffered trial testimony. Contrary to the Walkers' assertions, Dr. Huey's discovery deposition testimony did not concern only contents of an ultrasound report prepared by one of his colleagues. Admittedly, Dr. Huey did say he could not determine whether the subchorionic tear "had done anything different" between December 23, 1993 and February 16, 1994, based upon Dr. Weprin's report. Additionally, he did state in his deposition that Dr. Weprin's report failed to mention any expansion of the subchorionic tear.

More important, however, appellee's counsel also asked Dr. Huey the following questions:

"Q. It is possible to have a pregnancy to term with the findings of a small subchorionic tear such as what was found on Karen Walker's ultrasound of December 23 of '93?

"A. Yes, ma'am.

"Q. *And we—you do not know anything different about the status of that subchorionic tear from that date to the date of the miscarriage?*

"A. *Right.*

"Q. *And was there any information about it increasing in any way after the ultrasound of February 16th of '94?*

"A. *Unh-uh. No, ma'am.*

"Q. *So as far as we know, as we sit here today, that small subchorionic tear could have stayed exactly the same as it was from December 23rd of '93 forward?*

"A. *That's a possibility.*

"Q. And under that scenario, she could have had a term pregnancy?

"A. That's correct.

"Q. With respect to that tear, the subchorionic separation or tear, once the symptom of bleeding is gone, such as what Karen reported in December of '93, are there any other symptoms that one would be aware of that would indicate that the subchorionic tear is somehow threatening the pregnancy?

" * * *

"A. There don't have—it doesn't have to have anything else happen and can threaten a pregnancy but it can—the other side of it is it can expand and cause more bleeding and cramping.

"Q. And it can stay the same and not cause any problem with the pregnancy?

"A. That's correct.

"Q. *So, there are three—three ways that that small subchorionic tear can proceed?*

"A. *Uh-hum.*

"Q. *One is that it could stay the same and threaten the pregnancy?*

"A. Uh-hum." (Emphasis added.)

The foregoing questions and responses did not relate solely to the contents of Dr. Weprin's ultrasound report. In particular, Dr. Huey denied knowing *anything different* about the status of the subchorionic tear or bleed from December 23, 1993 until the February 1994 miscarriage. Additionally, Dr. Huey testified that there was *no information* about it increasing in size. Finally, Dr. Huey agreed that the subchorionic tear might have stayed *exactly the same size* and threatened Mrs. Walker's pregnancy.

In *Waste Mgt. of Ohio, Inc. v. Mid–America Tire, Inc.* (1996), 113 Ohio App.3d 529, 681 N.E.2d 492, we noted that the purpose of Civ.R. 26(E)(1)(b) is to prevent "trial by ambush." As a result, we reasoned that "[i]f discovery is to serve its purpose, the parties must be entitled, upon the unveiling of a contention, to a reasonable opportunity to prepare to defend against it." *Id.* at 533, 681 N.E.2d at 495, citing *Shumaker v. Oliver B. Cannon & Sons, Inc.* (1986), 28 Ohio St.3d

367, 371, 28 OBR 429, 432, 504 N.E.2d 44, 48. Consequently, "[a]lthough Civ.R. 26(E)(1)(b) does not require a party to give an opposing party notice of every nuance of an expert's opinion, it does require supplementation of the subject matter on which an expert is expected to testify." *Waste Management, supra,* 113 Ohio App.3d at 533, 681 N.E.2d at 494–495, citing *Tritt v. Judd's Moving & Storage, Inc.* (1990), 62 Ohio App.3d 206, 211–212, 574 N.E.2d 1178, 1182–1183. Furthermore, in *Shumaker,* the Ohio Supreme Court explained that an objective of Civ.R. 26(E)(1)(b) "is to provide opposing counsel with updated and complete discovery regarding the substance of expert testimony. This duty to supplement responses on the subject matter of expert testimony is necessary because preparation for effective cross-examination is especially compelling where expert testimony is to be introduced." *Shumaker, supra,* 28 Ohio St.3d at 370, 28 OBR at 431, 504 N.E.2d at 47.

Therefore, in the present case we must determine whether Dr. Huey's proposed trial testimony should be characterized as a nuance of his deposition testimony, or whether the trial testimony broached a new subject matter. In resolving this issue, we find particularly instructive the Tenth District Court of Appeals' decision in *Tritt.*[2] In that case, the appellants' expert, an accident reconstructionist, stated during a deposition that he had not performed any tests concerning appellant Tritt's truck. On cross-examination at trial, however, the same expert testified about an experiment he had performed on a taillight after his deposition but before the trial.

In light of this "surprise" testimony, the appellee argued that it was justified in having its own expert testify at trial concerning the distance from which the truck's taillight would have been visible and the results of his own out-of-court experiment. The Tenth District Court of Appeals rejected the appellee's argument, however, finding the appellee's self-described "rebuttal evidence" improper.

In so ruling, the *Tritt* court found the appellants' expert's trial testimony not violative of Civ.R. 26(E)(1)(b). *Id.* at 212, 574 N.E.2d at 1182. First, the court concluded that the appellee "was fully aware that [the appellants' expert] would testify in regard to the lack of illumination at the time and site of the accident, and the substance of that testimony did not change between the deposition and the trial." Furthermore, the court noted that "[m]ost important is the fact that [the appellants' expert's] testimony concerning the taillight test he performed was

---

2. The court's opinion in *Tritt* was written by Judge Whiteside, a well-respected member of the Ohio judiciary. Concurring in Judge Whiteside's opinion were Judge Young and Judge McCormac, the author of Ohio Civil Rules Practice (2 Ed.1992), a leading treatise on the Ohio Rules of Civil Procedure. Additionally, as a member of, and consultant to, the Rules Advisory Committee, Judge McCormac drafted and redrafted *several* of Ohio's Civil Rules and many of the accompanying staff notes.

introduced only as a result of cross-examination by appellee's counsel and was not mentioned during direct examination by appellants' counsel. Additionally, it was made clear on redirect that [the appellants' expert] did not rely on the result of the taillight test in forming an opinion." *Id.* at 212, 574 N.E.2d at 1183.

In the present case, however, the appellee was not "fully aware" that Dr. Huey would testify concerning the ultrasound's depiction of an expanded subchorionic tear. To the contrary, given the deposition testimony cited above, appellee Holland had absolutely no reason to anticipate Dr. Huey's opinion, which the doctor formed after reviewing the ultrasound the weekend before trial. Furthermore, Dr. Huey's proposed trial testimony did not arise on cross-examination as in *Tritt*. Instead, the doctor attempted, on direct examination, to change substantively his earlier deposition testimony. Specifically, Dr. Huey attempted to testify that certain evidence—*i.e.*, the February 16, 1994 ultrasound—showed an enlargement of Mrs. Walker's subchorionic tear.

This proposed testimony cannot be characterized as a mere "nuance" of his earlier deposition testimony. As we explained above, in his deposition Dr. Huey did opine that the automobile accident caused Mrs. Walker's miscarriage. Additionally, Dr. Huey opined that the subchorionic tear or bleed stemmed from the accident and caused the miscarriage. Significantly, however, Dr. Huey also stated in his deposition (1) that he had no information concerning expansion of the tear and (2) that the small subchorionic tear could have stayed the same size and still threatened Mrs. Walker's pregnancy. Consequently, appellee Holland reasonably could have anticipated Dr. Huey's testifying at trial concerning the accident causing the small tear and, in turn, the small tear causing the miscarriage. However, in light of Dr. Huey's deposition testimony, we find no reason for the appellee to have anticipated that the subject matter of Dr. Huey's testimony would encompass some expansion of the subchorionic tear. Furthermore, unlike the expert in *Tritt* who did not rely upon the results of the postdeposition taillight test when forming his opinion, Dr. Huey undeniably relied upon the results of his postdeposition, pretrial ultrasound review when forming his opinion that the subchorionic tear had expanded. Under these circumstances, we believe that the appellants had an obligation to supplement discovery pursuant to Civ.R. 26(E)(1)(b).

This court's rulings in two recent cases support the conclusion we reach today. In *Waste Management, supra*, the appellants claimed that the trial court should not have allowed the appellee's expert to offer an opinion at trial regarding the cause of a wheel explosion. The appellee's expert had provided a pretrial report in which he expressed the inability to "develop a definite conclusion" about the explosion's cause. Later, at trial, the expert viewed a high-quality reproduction

of a coroner's photograph and opined that the appellant's employees had caused the explosion.

Concluding that the trial court should have excluded this causation testimony, we reasoned that the surprise expert opinion, "revealed for the first time during trial, created the type of unfair surprise Civ.R. 26(E)(1)(b) is intended to prevent." Specifically, we determined that the difference between (1) having no opinion regarding causation and (2) stating that the appellant's employees caused the accident "was more than a 'nuance.'" Consequently, this court determined that the appellants "could not have been expected to anticipate [the expert's] testimony about the cause of the explosion and, as a result, they did not have a fair opportunity to respond to his new opinion." *Id.*

Similarly, in *Wimmers v. Camacho* (July 27, 1993), Montgomery App. No. 13272, unreported, 1993 WL 295081, the appellant contended that the court erred by excluding certain expert testimony presented on her behalf at trial. In a pretrial deposition, the appellant's expert never expressed an opinion, "even though he was given ample opportunity to do so," about whether a defendant doctor had a duty to closely monitor his patient for twenty-four hours. At trial, the expert witness then attempted to testify that the defendant doctor breached a standard of care by failing to provide twenty-four-hour observation. Although another expert provided the same testimony, and the appellee was prepared to rebut that expert's testimony, we upheld the trial court's exclusion of the first expert's opinion. In this court's view, the expert's proposed trial testimony concerning twenty-four-hour monitoring could not be characterized as a "nuance."

Likewise in the present case, we cannot characterize Dr. Huey's proposed testimony concerning expansion of the subchorionic bleed as a "nuance" of his deposition testimony. In his discovery deposition, Dr. Huey explained that a subchorionic tear can expand and cause a miscarriage. However, he admitted having no information about the tear increasing and also admitted not knowing "anything different" about the tear from the date of the first ultrasound test until the date of Mrs. Walker's miscarriage. Finally, Dr. Huey opined that Mrs. Walker's subchorionic tear could have "stayed the same" and still threatened her pregnancy. Later, at trial, Dr. Huey attempted to express his opinion that the tear had, in fact, expanded. He based this opinion upon his review, the weekend before trial, of the actual February 16, 1994 ultrasound.

Under these circumstances, we perceive Dr. Huey's proffered trial testimony as more than a mere nuance of his deposition testimony. Although Dr. Huey stated in his deposition that the accident caused a small tear and the miscarriage, the doctor did not opine that Mrs. Walker's tear had, in fact, expanded. This new opinion should have been disclosed to enable the appellee's counsel to prepare effective cross-examination.

In opposition to this conclusion, the Walkers rely upon *Sowers v. Middletown Hosp.* (1993), 89 Ohio App.3d 572, 626 N.E.2d 968. In *Sowers*, the appellants contended that the trial court erred by allowing the "surprise" testimony of a defense expert witness. In her deposition, the expert could not form an opinion about whether a baby sustained neurological damage while developing or during labor and delivery. Subsequently, at trial, the expert expressed her opinion that the neurological injury did not occur during labor and delivery.

Despite the apparent inconsistency, the Twelfth District Court of Appeals found the expert's testimony nonprejudicial for the following reasons:

"First, appellants had sufficient opportunity to impeach Dr. Ferriero on cross-examination. In fact, appellants questioned Dr. Ferriero in detail concerning her deposition testimony. Dr. Ferriero responded to appellants' questions with a reasonable explanation as to why she felt her deposition and trial testimonies were consistent.

"Second, appellants could not have been surprised by the testimony on the timing issue as that issue was the central causation question at trial. Also, another defense expert witness who testified before Dr. Ferriero, Harlan Giles, M.D., testified that in his opinion Richard's neurological injury did not occur during labor and delivery.

"Third, there is simply no evidence that appellees deliberately attempted to mislead appellants regarding the substance of Dr. Ferriero's testimony. Appellees were obligated under Civ.R. 26(E)(1) to notify appellants of changes or additions in the subject matter of Dr. Ferriero's testimony, but not 'each and every nuance' of her testimony. [Citations omitted.] Through discovery and pretrial statements appellants were well aware that Dr. Ferriero would testify on causation issues. Accordingly, appellees did not violate their duty to supplement [their] discovery response." *Id.* at 590, 626 N.E.2d at 980–981.

After reviewing *Sowers* and this court's *Waste Management* and *Wimmers* decisions, we find the Walkers' reliance upon *Sowers* unpersuasive. Initially, we note that the factual scenarios in each of the three cases are nearly identical. In each case, an expert witness provided no opinion on an issue before trial and then attempted to express an opinion at trial. Confronted with these circumstances in *Waste Management* and *Wimmers*, we found a duty to supplement arising under Civ.R. 26(E)(1)(b). Conversely, in *Sowers*, the Twelfth District Court of Appeals found no duty to supplement discovery responses.

Upon careful reflection, however, we find *Sowers* unpersuasive and, at least in part, distinguishable. Declaring the expert's trial testimony nonprejudicial, the *Sowers* court first noted that the appellants had a sufficient opportunity to impeach the expert on cross-examination. The court also stressed that another

defense expert provided trial testimony identical to the challenged testimony. Furthermore, the *Sowers* court reasoned that the appellants could not have been surprised by Dr. Ferriero's testimony because the "timing issue" was "the central causation question at trial." Additionally, the court noted the absence of evidence suggesting that the appellees deliberately attempted to mislead the appellants.

In the present case, however, Holland's counsel likely would have been unable to effectively cross-examine Dr. Huey without being told that he had reviewed the ultrasound itself and formed an opinion. As the Ohio Supreme Court noted in *Shumaker*, "preparation for effective cross-examination is especially compelling where expert testimony is to be introduced." *Shumaker, supra,* 28 Ohio St.3d at 370, 28 OBR at 431, 504 N.E.2d at 47. Presumably, the *Sowers* court found the appellants sufficiently able to cross-examine the appellee's expert at least in part because another defense expert testified earlier and provided the same testimony. In the present case, however, no other expert testified that Mrs. Walker's subchorionic tear had, in fact, expanded. Furthermore, in *Wimmers, supra,* we upheld the exclusion of testimony from a party's expert witness even though a second expert offered the same testimony and the appellee was prepared to rebut that testimony.

The *Sowers* court also reasoned that the appellants could not have been surprised by an expert's testimony on "the timing issue" because it was "the central causation question at trial." In the present case, however, the central causation questions were whether the accident caused the subchorionic tear and whether the tear caused the miscarriage. Dr. Huey offered his opinion on these subjects in pretrial deposition testimony. Significantly, however, he *did not* opine that Mrs. Walker's tear had expanded. In fact, when questioned on the subject, he professed to have no knowledge that the tear had increased, and he agreed that the small tear could have affected Mrs. Walker's pregnancy. Later, at trial, Dr. Huey did have knowledge that Mrs. Walker's subchorionic tear had increased.

In our view, the appellee likely would have been surprised by this proposed testimony. Furthermore, in both *Waste Management* and *Wimmers,* the experts involved offered no opinion on a critical issue before trial. The experts then attempted to express an opinion at trial. We found exclusion of this testimony proper notwithstanding the fact that it concerned a "central" issue.

██ Indeed, it is well established that expert testimony may be excluded as a sanction for violating Civ.R. 26(E)(1)(b). *Waste Management, supra; Shumaker, supra,* at 370, 28 OBR at 431–432, 504 N.E.2d at 47. Furthermore, the Ohio Supreme Court has held that the admission or exclusion of evidence rests with the sound discretion of the trial court. *State v. Withers* (1975), 44 Ohio St.2d 53,

55, 73 O.O.2d 280, 281, 337 N.E.2d 780, 781–782. Absent an abuse of the trial court's discretion and material prejudice to the affected party, reviewing courts should be slow to interfere. *Id.*

In the present case, we cannot say the trial court abused its discretion by excluding Dr. Huey's proposed trial testimony. The doctor's surprise opinion, which he formed the weekend before trial, could not have been anticipated. In his pretrial deposition, Dr. Huey denied having knowledge that the subchorionic tear had expanded. Dr. Huey then professed to have an opinion on the subject at trial. In our view, this change cannot be characterized as a "nuance," and the trial court did not abuse its discretion by rejecting the testimony. See *Long v. Isakov* (1989), 58 Ohio App.3d 46, 51, 568 N.E.2d 707, 712 (recognizing that "[t]he failure of a party to supplement discovery when its expert witness formulates or changes an opinion may be grounds for reversible error"). Accordingly, we overrule the Walkers' first assignment of error.

In their second assignment of error, the Walkers claim that the jury's verdict is against the manifest weight of the evidence. Specifically, the Walkers contend that the manifest weight of the evidence supports awarding them damages at least equal to Mrs. Walker's emergency room bills. In support of their argument, the Walkers insist that the record demonstrates some objective manifestations of injury suffered by Mrs. Walker. Furthermore, given her physical complaints following the accident, they contend that diagnostic medical treatment was appropriate.

As we review the Walkers' argument, we remain mindful that factual determinations properly are made by the trier of fact. Additionally, determining the weight given to evidence and assessing the credibility of witnesses are tasks primarily performed by the trier of fact. Consequently, a lower court's judgment will not be reversed as against the manifest weight of the evidence if the judgment is supported by some competent, credible evidence going to all the essential elements of the case. *Studebaker v. Staudter* (Aug. 30, 1996), Montgomery App. No. 15508, unreported, 1996 WL 491795, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578.

After reviewing the record, we find competent, credible evidence supporting a finding that Holland did not cause Mrs. Walker's physical ailments or her miscarriage. As appellee Holland stresses in his brief, the record contains testimony that Mrs. Walker had experienced, and received treatment for, neck and back problems since 1983. Mrs. Walker also testified that those problems "flared up" following a 1991 automobile accident and troubled her intermittently thereafter. In fact, the record reveals that Mrs. Walker received treatment from

Richard Teeters, a Dayton chiropractor, just ten days before her December 23, 1993 automobile accident with Holland.

Other than her complaints of "soreness" in her neck and "pelvic cramping," Mrs. Walker identified no other physical symptoms immediately following her accident. Furthermore, the record contains testimony from Dr. Steven John DeVoe, who testified that cramping during a pregnancy is so common that "you cannot attach a lot of significance to it by itself." Additionally, as we noted above, Mrs. Walker had received treatment for neck problems just ten days before the accident. Mrs. Walker did allege that she later developed a bruise on her abdomen, but no medical records or doctor's testimony substantiated this claim.

The record also contains testimony from Dr. Richard Teeters, who confirmed the hospital's diagnosis of an acute cervical strain. He also testified that Mrs. Walker sustained a "severe acute sprain/strain to the cervical spine of the neck, the thoracic spine of the upper back, and her left shoulder." Dr. Teeters further testified that Mrs. Walker had "ligamentous instabilities" and "some myofascitis with some nerve root irritation." In Dr. Teeters's opinion, Mrs. Walker's accident with Holland caused these injuries.

After reviewing the entire record, however, we find competent, credible evidence supporting a finding that Holland did not cause Mrs. Walker's physical problems. Although the record contains evidence suggesting that Holland did cause some physical injury, the record also reveals evidence supporting a contrary conclusion. As we explained above, the jury's function was to weigh the evidence and assess the credibility of the witnesses. In performing its role, the jury remained free to believe or disbelieve the testimony from any witness on the issues of causation and damages. After reviewing the entire record, we cannot say that the finding that appellee Holland's negligence did not cause any physical injuries is against the manifest weight of the evidence.

Likewise, we cannot say the jury's determination that Holland's negligence did not cause Mrs. Walker's miscarriage is against the manifest weight of the evidence. Mrs. Walker's own expert, Dr. Huey, admitted that he could not be sure whether the subchorionic bleed occurred before or after the accident. He also noted that a subchorionic bleed can occur without any trauma. Additionally, Dr. Huey had opined in an April 5, 1994 report to the Walkers' attorneys that "it is very difficult for me to speculate as to the probability of the loss of the pregnancy related to the accident. It would be very easy to argue from either side of the argument."

Furthermore, appellee Holland's expert, Dr. DeVoe, testified that a two-month-old fetus is well protected by pelvic structures. He also stated that miscarriages occur for a variety of reasons and that the cause of a particular miscarriage often

is impossible to determine. Additionally, Dr. DeVoe explained that the risk of a miscarriage increases if conception occurs within three months of a prior miscarriage. In the present case, Mrs. Walker suffered a miscarriage in September 1993, just six to seven weeks before conceiving the child she miscarried allegedly as a result of Holland's collision with her car. Finally, Dr. DeVoe opined that the December 23, 1993 automobile accident at issue "had nothing to do with the miscarriage eight weeks later." Although Mrs. Walker presented expert testimony reaching an opposite conclusion, the foregoing statements represent competent, credible evidence to support a finding that Holland's negligence did not cause Mrs. Walker's miscarriage.

 Nevertheless, the Walkers argue that even assuming Holland's negligence proximately caused no objective injuries, Mrs. Walker was entitled to compensation for the medical expenses she incurred immediately after the accident. In particular, the appellants contend that the emergency room examination and ultrasound test Mrs. Walker received were appropriate under the circumstances. Consequently, the Walkers claim that the manifest weight of the evidence supports finding that Holland's negligence proximately caused this "economic injury."

We agree. Although the jury determined that Holland's negligent driving did not cause Mrs. Walker's miscarriage or any physical injuries, it cannot be disputed that Holland's negligence caused Mrs. Walker to undergo an emergency room examination and an ultrasound test. In light of Mrs. Walker's pregnancy and the substantial damage done to her vehicle in the head-on accident, we agree that she received appropriate medical treatment. Common sense would dictate, at a minimum, that a pregnant woman should undergo such testing. Furthermore, in the present case, Dr. Huey also testified that Mrs. Walker's treatment was appropriate.

In his brief to this court, however, Holland cites *Reder v. Antenucci* (1989), 62 Ohio App.3d 139, 574 N.E.2d 1137, for the proposition that "medical expenses for diagnostic tests are not recoverable in the absence of causation and injury." In that case, the Trumbull County Court of Appeals reasoned that "[w]ithout injury and causation, there could be no damages for medical expenses or otherwise." *Id.* at 142, 574 N.E.2d at 1139. In reaching this conclusion, the *Reder* court relied upon *Muncy v. Jones* (Jan. 19, 1984), Franklin App. No. 83AP–562, unreported, 1984 WL 4597.

In *Muncy,* the court reasoned as follows:

"In order for the medical bills to be the subject of compensatory damages, plaintiffs were required to establish a causal connection between the defendant's negligence and the expenses, and expert testimony was required to establish the necessity of the treatment which resulted in the billings. On the other hand,

simply because plaintiffs' expert testified that the billings were necessitated by the accident, they are not automatically entitled to prevail on the question of necessity, even where their expert's testimony on that point is not directly controverted by defendant's evidence, so long as there appear in the record objectively discernible reasons upon which the jury could rely to reject the expert's opinion testimony. *State v. Brown* (1983), 5 Ohio St.3d 133, at 135 [5 OBR 266, at 267, 449 N.E.2d 449, at 450–451]."

In the present case, a fair reading of the record *does* establish a causal connection between Holland's negligence and Mrs. Walker's medical expenses. Furthermore, the Walkers *did* present expert testimony concerning the propriety of Mrs. Walker's treatment. This testimony was not contradicted by appellee Holland's expert witness. Thus, pursuant to *Muncy*, absent some "objectively discernible reasons" upon which the jury could have relied to deny damages for the medical bills, the Walkers are entitled to compensation for the expenses. Based upon our review of the record, we find nothing in the record to support a conclusion that Holland's negligence did not proximately cause the medical expenses incurred by the Walkers. Accordingly, the jury's refusal to award Mrs. Walker damages for diagnostic medical tests performed immediately following the accident is against the manifest weight of the evidence. See *Minney v. Guthrie* (Jan. 12, 1989), Greene App. No. 88–CA–37, unreported, 1989 WL 2182 (noting that "[b]oth experts agreed that it was reasonable for Minney to have sought emergency room treatment and follow-up neck therapy after the collision. At a minimum, the manifest weight of the evidence supports an award of damages for Minney's emergency room care immediately following the collision.").

Having reached this conclusion, we are compelled by *Hanna v. Wagner* (1974), 39 Ohio St.2d 64, 68 O.O.2d 37, 313 N.E.2d 842, to remand for a new trial. In *Hanna*, the Ohio Supreme Court ruled that in a jury case, an appellate court may not enter a final judgment based upon the weight of the evidence. Instead, the appellate court must remand the cause for a new trial. *Id.* at 66, 68 O.O.2d at 38, 313 N.E.2d at 843. "It is obvious that to do otherwise would be the denial of the fundamental right to a jury trial." *Id.* See, also, *Horrisberger v. Mohlmaster* (1995), 102 Ohio App.3d 494, 501, 657 N.E.2d 534, 539 (quoting *Hanna* and holding that "[w]hen an appellate court reverses on the manifest weight of the evidence in a case in which a jury was the trier of fact, the appellate court 'may not enter final judgment on the weight of the evidence but must remand the cause for a new trial.' ").

Accordingly, we will sustain the Walkers' second assignment of error in part, reverse the lower court's judgment in part, and remand this cause for a new trial on the limited issue of whether Holland's negligence proximately caused Mrs. Walker to sustain damages equaling her emergency room bills. We overrule the

Walkers' second assignment of error to the extent it challenges the jury's finding that Holland's negligence did not cause Mrs. Walker's miscarriage or any physical injuries. Those findings are not against the manifest weight of the evidence and should not be retried upon remand.

In their third assignment of error, the Walkers contend that the trial court erred by providing the jury with improper instructions concerning damages for a miscarriage. Specifically, the Walkers claim that the trial court improperly limited them to recovering damages for pain and suffering for the actual miscarriage itself. They contend that the trial court's jury instructions did not allow them to recover for future grief, pain, and suffering stemming from the miscarriage.

The jury's verdict, and our holding above, however, render this assignment of error moot. As a prerequisite to receiving *any* damages for the miscarriage, Ohio law required the Walkers to demonstrate that appellee Holland's negligence proximately caused the miscarriage. Without establishing causation, Holland would not be liable for any pain and suffering damages related to the miscarriage.

In an uncontested portion of the jury instructions, the trial court instructed the jury as follows: "If the plaintiff has failed to prove by a preponderance of the evidence that the defendant's negligence was a proximate cause of any injury to the plaintiff, then your verdict should be in favor of the defendant and you need not proceed further, except to sign the appropriate verdict in favor of the defendant and against the plaintiffs."

As the appellee properly notes in his brief, "Since the jury determined that the defendant was not liable to the plaintiffs and returned a verdict in favor of the defendant, the alleged failure to properly instruct the jury with respect to damages is necessarily rendered harmless." Furthermore, based upon our review of the record, we find adequate evidence to support a conclusion that Holland's negligence did not cause the miscarriage. Accordingly, we find any alleged error in the trial court's jury instructions harmless, and we overrule the Walkers' third assignment of error.

Having sustained the Walkers' second assignment of error as it relates to damages for medical expenses, however, we reverse the judgment of the Montgomery County Common Pleas Court in part and remand this cause for a new trial on that issue alone.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

WOLFF and GRADY, JJ., concur.