OPINION
{¶ 1} In this case, Jeffrey Pryor appeals from a jury verdict in favor of Defendant, John Tooson. Pryor also appeals from a trial court decision rejecting his motion for a new trial.
 {¶ 2} Pryor's claims arose from a rear-end collision that took place on December 20, 1998, in Springfield, Ohio. At the time, Pryor and his wife lived in Baltimore, Maryland, and were visiting relatives in Springfield. While Pryor was stopped at a traffic light, his car was rear-ended by Tooson's auto. Tooson's speed on impact was only about 15 miles per hour, and Pryor's car was not significantly displaced or moved by the collision. Although the repairs to Pryor's car cost about $3,000, the pictures of the auto show only minor damage to the rear bumper and left taillight.
 {¶ 3} At the scene, Pryor had no visible injury. However, the EMS report indicates that he complained of minor neck pain. As a result, he was taken by ambulance to the emergency room. X-rays were normal, and his neck had a full range of motion. Consequently, Pryor was discharged from the emergency room with a diagnosis of possible soft-tissue injury and a prescription for pain medication. After spending the Christmas holidays in Springfield, Pryor and his family then returned to Baltimore.
 {¶ 4} By December 30, 1998, Pryor had already obtained legal counsel. On that date, he visited a Baltimore doctor, complaining of pain in his neck, left shoulder, and upper arm. He then had about 10 therapy visits, receiving massage and ultrasound. Subsequently, in January, 1999, Pryor saw an orthopedic surgeon and a neurologist, who offered surgical fusion at C6-7 due to the presence of a left lateral herniated intervertebral disc. Surgery was not performed, however, because Pryor and his wife were in the process of moving back to Springfield.
 {¶ 5} Between February, 1999, and late April, 2000, Pryor had no treatment or visits with doctors for neck pain, nor did he complain of neck, shoulder, or arm pain. In fact, when Pryor first saw a doctor after returning to the Springfield area, his complaints were vomiting, stomach cramps, migraines, and marital stress. This was in late August, 1999. At that time, Pryor reported that his symptoms had begun a week earlier after a fight with his spouse. He reported a history of nerves and anxiety, including a history of migraine headaches. According to Pryor, an out-of-state doctor had previously done an extensive work-up for migraines. The auto accident in 1998 is not mentioned in the office notes for this visit, nor is it connected to the migraines. In addition, the doctor's notes for this visit do not mention neck or shoulder pain. On physical examination, the neck was found to be "supple." During several subsequent doctor visits (about 13) and emergency room treatments (two) over the next eight months, Pryor did not complain about neck pain, and, in fact, denied any neck pain. He was treated during this time for tension headaches.
 {¶ 6} In April, 2000, Pryor complained of a new type of headache that differed from the previous tension headaches. However, he gave an inconsistent history about the origins of this type of headache. For example, Pryor went to the emergency room late in the evening of April 20, 2000. At that time, he said he had woken up at 3 p.m. with a "new" type of headache. He then tried to go to work, and lost his balance while getting out of the car. This caused him to fall and strike his head on the back of his car. However, he claimed this was a minor bump, and said his reason for coming to the emergency room was because of the headache pain.
 {¶ 7} In contrast, Pryor reported to his family doctor on April 24, 2000, that he had a "new" kind of headache that had originated two days before (on April 22, 2000). Pryor indicated that while driving, he had turned his head to the left and felt a spasm. He also reported that "since" that time, he had a headache that started in the back and went around his head. He did not mention the fall of April 20, 2000, or the "new" headache pain that began at home on April 20, 2000.
 {¶ 8} Subsequently, Pryor was referred to Dr. Goldstick, a neurologist, who found that Pryor had significant cervical spondylitic disease (arthritis), marked primarily by bulging and hard disc formation with spur formation on the C5-6 level toward the left and at least a small herniated disc. Goldstick also reported a broad-based herniated disc extending to the left at the C6-7 level. Accordingly, Goldstick recommended conservative management and physical therapy. If physical therapy did not help, Goldstick recommended trigger point injections, and then surgery as a last resort.
 {¶ 9} Dr. Goldstick's initial examination was performed on July 14, 2000. At that time, Pryor did not tell Goldstick about having tension headaches, nor did he mention his history of migraines before the 1998 auto accident. He did mention the 1998 auto accident and treatment he had received for neck pain after the accident. Dr. Goldstick's notes indicate that the prior neck pain had resolved to a large extent after the initial treatment, and that Pryor "has had some intermittent neck pain on a rare basis involving the cervical region and the trapezius regions, but this has been very mild."
 {¶ 10} Despite Goldstick's recommendations, Pryor did not begin physical therapy until January, 2001. Pryor was discharged in April, 2001, before his therapy treatments were finished, due to non-compliance with the therapist's "no-show" policy. Pryor also did not obtain trigger point injections as recommended, until about a month before the September, 2002 trial.
 {¶ 11} At trial, Pryor submitted Dr. Goldstick's video-tape deposition into evidence. Dr. Goldstick testified that the auto accident aggravated Pryor's pre-existing bulging disc and caused a herniated disc. Goldstick also believed that Pryor's headaches were related to the arthritis in the neck and the disc formation. Goldstick did admit that his opinions were based on the history Pryor had provided. Nonetheless, he testified that the questions he was asked during cross examination (including inquiries about prior injuries) would not change his opinion about the cause of the injury. The defense did not present any medical testimony, but relied on cross-examination of Goldstick.
 {¶ 12} As we mentioned, this case was tried in September, 2002. By that time, Pryor had been off work nearly two years (since November 15, 2000), for medical reasons. Allegedly, on that date, Pryor passed out at his workstation (a saw processor). He never returned to work thereafter.
 {¶ 13} At trial, Pryor's testimony was replete with contradictions. For example, Pryor testified that he blacked out at his workstation on November 15, 2000, and fell to the concrete floor. He claimed he did not go to the hospital, but later reported the fall to Dr. Goldstick. However, the medical records indicate that Pryor did go to the emergency room on November 15, 2000, complaining of a right frontal headache since the previous day, with blurred vision and nausea. Significantly, the hospital records do not mention any type of fall or blackout.
 {¶ 14} Two days later, on November 17, 2000, Pryor saw Dr. Goldstick and complained of pain in his neck, not about a headache. These records also fail to document any fall or blackout.
 {¶ 15} At various times during his testimony, Pryor denied statements about his medical history that were attributed to him in the medical records. For example, an emergency room record for the December 20, 1998 auto accident indicates that Pryor's past medical history includes "family polyposis, migraine headaches, [and] chronic allergies." Pryor denied telling the emergency room personnel this, and said the record was inaccurate. Similarly, the records of Dr. Montcrief, a neurologist, indicate that Pryor said he was hit in the rear by a car traveling 50 miles per hour. Again, Pryor denied making such a statement.
 {¶ 16} Another discrepancy involved Pryor's claim that he was not having any kind of discomfort in his body before the accident, and that his health was good. In contrast, Pryor's medical history before the accident included colon cancer, removal of the colon, and placement of an ileostomy; esophageal dilation for gastroesophageal reflux disease; upper and lower endoscopies; inguinal hernia repair, appendectomy, trouble with nerves and anxiety; migraine headaches, chronic allergies, and a skull fracture. The records also mention chronic back pain, although they do not indicate exactly when that began.
 {¶ 17} The skull fracture was caused when Pryor's brother hit him in the head with a vase. As a result of the blow, a plate and screws were inserted in the left front area of Pryor's head. Furthermore, after the blow, Pryor could not see out of his left eye for six months. Pryor also had two other auto accidents before the 1998 rear-end collision. In one accident, Pryor's car was stuck by a semi-truck on the turnpike and was pinned against a wall. Pryor denied any injury from this accident, other than a wrist injury that did not require medical treatment. Additionally, Pryor was in an accident as a teenager while riding in a car driven by his brother. The brother failed to stop at a stop sign, and hit a rock or stone wall. However, Pryor claimed he was not injured because he was able to see the accident coming, and braced himself.
 {¶ 18} Pryor also said he had been in pain continually since the 1998 accident. He attributed all his problems, including his neck pain, marital problems, headaches, and inability to work, to the 1998 accident. Again, the medical records contradicted these claims. Pryor also denied any effect on his daily life from any of his pre-existing medical conditions or problems.
 {¶ 19} The defendant, John Tooson, testified that nothing happened to him at the time of impact, i.e., he did not make contact with any object in the car, nor was there any pull on the strap of his shoulder harness. Tooson felt only a "bump" and his vehicle stopped on impact. The other car traveled forward about a foot and a half after being hit.
 {¶ 20} Because Tooson admitted negligence, the jury's task was to decide if the claimed injuries and damages were proximately caused by the accident. After hearing the evidence, the jury returned a verdict for the defendant. Pryor then filed a motion for new trial, which was overruled by the judge, and this appeal followed. In support of the appeal, Pryor raises the following single assignment of error:
 {¶ 21} The trial court erred in denying Appellant's motion for a new trial as the jury's verdict in favor of Appellee was against the manifest weight of the evidence because negligence was admitted and the evidence that at least some injury arose out of said negligence went uncontested.
 {¶ 22} After reviewing the record and applicable law, we reluctantly find that the assignment of error has merit. Accordingly, we will reverse the trial judgment of the trial court and remand this matter for a new trial.
 I {¶ 23} We have discussed the facts of this case in some detail because the decision to reverse was not an easy one. As we indicated, the jury awarded judgment to the defendant, and the trial judge refused to set that aside. Based on the conflicts in Pryor's testimony, the jury and trial judge appear to have felt that Pryor's testimony lacked credibility. Pryor's position was also not enhanced by his request during closing argument for $216,000, for what appears to have been a minor injury.
 {¶ 24} Nonetheless, while the record indicates that any injury was minimal, we cannot completely discount the objective finding in the February, 1999 MRI of a left lateral herniated disc at C6-7. The herniated disc may have resulted from pre-existing injuries, or from pre-existing degenerative disease, or from the 1998 accident. It may also have been caused by a combination of one or more of these factors. Pryor presented evidence indicating that the herniated disc was caused by the accident, and the defense cross-examination and evidence did not clearly discount this theory.
 {¶ 25} More important, the defense failed to submit sufficient evidence to support an alternate explanation. For example, the defense could have provided its own expert to testify that Pryor's complaints were caused by pre-existing degenerative disc disease or a previous accident. We recognize that the jury does not have to give any weight to an expert medical opinion. See, e.g., McCall v. Mareino (2000),138 Ohio App.3d 794, 799. The defense also does not have to present its own expert, and may rely on cross-examination of the plaintiff's expert.Mackey v. McCormick (Aug. 29, 1997), Trumbull App. No. 96-T-5517, 1997 WL 531243, *3.
 {¶ 26} By the same token, where an objective finding exists on a medical test, and the matter is not within the common knowledge of most individuals, medical explanations would help. This is particularly true where, as here, no medical records were submitted that pre-dated the accident. Consequently, even though defense counsel successfully cast doubt on Pryor's credibility and the extent of his injuries, the evidence about other causes for the disc problem could have been more clear. In this regard, we note that medical records concerning Pryor's previous accidents or medical problems would have been very helpful in sorting out what injuries, if any, were proximately caused by the 1998 accident.
 {¶ 27} Under Civ.R. 59(A)(6), a new trial may be granted if the judgment is not sustained by the weight of the evidence. The general standard applied in this situation is that "[a]n order granting or denying a motion for new trial should not be reversed on appeal absent an abuse of discretion." Meyer v. Srivastava (2001), 141 Ohio App.3d 662,667. Abuse of discretion means "`more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.'" Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. However, we have stressed on various occasions that decisions are unreasonable if they are not supported by a sound reasoning process. See, e.g., Jackson v. Jackson (2000), 137 Ohio App.3d 782, 799, citingAAAA Enterprises, Inc. v. River Place Community Urban RedevelopmentCorp. (1990), 50 Ohio St.3d 157, 161.
 {¶ 28} In deciding whether a judgment is sustained by the weight of the evidence, the standard for civil cases, taken from the criminal context, is that:
 {¶ 29} "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52, quoting from State v. Martin (1983), 20 Ohio App.3d 172, 175. See also, Bede v.Dayton Power Light Co., Montgomery App. No. 18705, 2002-Ohio-2378, ¶ 34-35.
 {¶ 30} Pryor argues that the verdict is against the weight of the evidence and that overruling the motion for new trial was unreasonable because the evidence about complaints of pain at the scene and Pryor's initial medical treatment was uncontroverted. Therefore, he believes some award should have been made. In response, Tooson contends that Pryor's subjective complaints were not objectively verifiable, and the jury was in the best position to assess Pryor's credibility. Both sides have cited case law to support their positions, but the reality is that most of these decisions are based on the facts of the particular case. However, in Walker v. Holland (1997), 117 Ohio App.3d 775, we did apply a useful analysis.
 {¶ 31} In Walker, the plaintiff was involved in a low-speed, head-on auto accident. She was two months pregnant at the time, and was transported to the emergency room, where she complained of pelvic cramping and neck soreness. An ultrasound revealed a small subchorionic bleed, meaning that the placenta was separated slightly from the uterus wall. The plaintiff was also diagnosed with an acute cervical strain in her neck. Ultimately, she miscarried, and then brought suit against the driver of the other car, claiming his negligence caused various physical ailments, including the miscarriage and neck problems. According to the evidence, the plaintiff had pre-existing neck and back problems and had received treatment for them shortly before the accident. Id. at 791-92. She also had only subjective physical symptoms after the accident. Although medical testimony was offered connecting the neck problems with the accident, the jury found for the defendant. Id. at 792 and 778.
 {¶ 32} On appeal, the plaintiff claimed that the jury verdict was against the manifest weight of the evidence. We disagreed as to claims regarding the miscarriage and other physical ailments, due to conflicting testimony about whether the accident caused some physical injury. Id. at 792. We did agree, however, that a new trial should be allowed on the limited issue of whether the defendant's negligence had proximately caused the plaintiff to sustain damages equaling her emergency room visits. Id. at 794. In this regard, we applied the following theory:
 {¶ 33} "`In order for the medical bills to be the subject of compensatory damages, plaintiffs were required to establish a causal connection between the defendant's negligence and the expenses, and expert testimony was required to establish the necessity of the treatment which resulted in the billings. On the other hand, simply because plaintiffs' expert testified that the billings were necessitated by the accident, they are not automatically entitled to prevail on the question of necessity, even where their expert's testimony on that point is not directly controverted by defendant's evidence, so long as there appear in the record objectively discernible reasons upon which the jury could rely to reject the expert's opinion testimony.'" Id. at 793-94, quoting fromMuncy v. Jones (Jan. 19, 1984), Franklin App. No. 83AP-562, 1984 WL 4597, *1.
 {¶ 34} In Walker, we found that the plaintiff did present expert testimony about the propriety of the emergency room treatment that was not contradicted by the defendant's expert. As a result, the plaintiff was entitled to compensation for these expenses, "absent some `objectively discernible reasons' upon which the jury could have relied to deny damages for the medical bills." 117 Ohio App.3d at 794.
 {¶ 35} We do note that in various cases, the jury's decision to deny recovery, even for emergency room or initial medical treatment, has been upheld. See, e.g., Sawyer v. Duncan (Dec. 14, 2000), Cuyahoga App. No. 78056, 2000 WL 1844758 (rear-end collision with no apparent damage to plaintiff's vehicle and no significant findings at emergency room); Ilerv. Wright, Cuyahoga App. No. 80555, 2002-Ohio-4279, ¶ 20 (low-speed, low-impact collision; plaintiff told police she was not injured, did not immediately seek medical attention, and had degenerative disc disease); Mackey (Aug. 29, 1997), Trumbull App. No. 96-T-5517, 1997 WL 531243 (only minor rear bumper damage to plaintiff's auto; sole objective sign of injury attributed to degenerative cervical spine condition); and McCall (2000), 138 Ohio App.3d 794 (collision was very minor, "upon which the jury could conclude that the claimed injuries, which did not immediately manifest themselves, were either wholly manufactured, grossly overstated, or not proximately caused by the collision." Id. at 800. Additionally, "there was no neurological or orthopedic damage or other objective findings of injury.")
 {¶ 36} Damage awards below the plaintiff's total medical expenses or rejecting any award for pain and suffering have also been upheld. See, e.g., Taylor v. Board (2000), Miami App. No. 2000 CA 26, 2000 WL 1369887, *2 (plaintiff's own doctor testified that she was "exaggerating her injuries"); Haller v. Daily, Montgomery App. No. 19420,2003-Ohio-1941, ¶ 20 (plaintiff was awarded medical expenses, but nothing for pain and suffering); and Dottavio v. Shepherd (Dec. 1, 1999), Summit App. No. 98C0042, 1999 WL 1140873, *4 (jury awarded plaintiff about half her medical expenses and minimal amount for pain and suffering. Appellate court found that jury verdict was not contrary to weight of evidence, nor were damages inadequate, due to doubt cast on plaintiff's credibility and evidence that she was exaggerating her injuries.)
 {¶ 37} As we said, a review of these cases indicates that the decisions are highly fact-intensive. The jury in the present case could easily have awarded Pryor very minimal damages based on the present record. The jury also could have found, with a more adequate record, that Pryor's complaints were due to pre-existing conditions. However, because the objective findings on the February, 1999 MRI were not adequately addressed, we are compelled to find that the judgment was against the weight of the evidence. Consequently, the trial judge did abuse his discretion when he refused to order a new trial. As we stressed earlier, we make this decision reluctantly, due to the significant credibility issues that exist.
 {¶ 38} Based on the preceding discussion, the single assignment of error has merit and is sustained. Accordingly, the trial court judgment is reversed, and this case is remanded for further proceedings.
FAIN, P.J., and YOUNG, J., concur.